ALVIN MALTBY. ET AL. v. CHARLES H. PLUMMER.

Contract—Logs and logging—Pleading—Notice of recoupment—
Damages—Charge to jury.

1. Where a contract provides for the delivery, upon the cars, of all of the merchantable white pine on certain descriptions of land that the owner should deem fit for a specified market, and for the delivery of the remainder of the timber at the owner's mill, it is his duty to designate in some proper manner the *first* class of logs, and if he gives a *general* description, and leaves the *particular* designation to the *judgment* of the contractors or their foreman, or the scaler agreed upon by the parties, *which* is fairly and honestly exercised, he is bound thereby.

2. A notice of recoupment which alleges that, by reason of the plaintiffs' failure to deliver logs in sufficient quantities to keep the defendant's mill constantly supplied for sawing purposes,

defendant was compelled to shut down said mill a large number of times, and keep a large number of men idle, whereby he was prevented from putting his lumber on the market, and from filling his orders and performing his contracts, and lost great gains and profits, states defendant's claim for damages·in no other than the most speculative way, and fails to present a fact to be tried as to damages.

3. In such a case it is not error for the court to exclude from the consideration of the jury the alleged loss of profits, and to instruct them that if defendant had men permanently employed, and was obliged to and did pay them while thus compelled to remain idle, the amount paid would be a legitimate item of damage ; but that the employés who worked by the day, and who were not paid for such lost time, he could not charge for. *Allis v. McLean*, 48 Mich. 428.

4. The provision in the contract in this case for "keeping logs of particular lengths by themselves," as delivered on the skids at the mill, is construed to mean that the logs to be used for bill stuff should be kept separate from the other shorter logs.

5. In a case involving an alleged double payment to a witness for work, which he denied, an expression by the court in his charge to the jury of doubt as to the honesty of the witness in receiving such double pay is held prejudicial error.

6. Where the testimony as to a given fact is direct and positive on both sides, and plainly irreconcilable, it is the province of the jury to determine which party is right, and it is error for the court to instruct them that there is an entire misapprehension between the parties upon the disputed question.

Error to Bay. (Green, J.)  Argued April 26, 1888. Decided October 19, 1888.

*Assumpsit.* Defendant brings error. Reversed. The facts are stated in the opinion and foot-notes.

*Tarsney & Weadock (T. A. E. & J. C. Weadock,* of counsel), for appellant, contended as stated in the opinion.

*J. L. Stoddard (Benton Hanchett,* of counsel), for plaintiffs, contended:

1. The contract being silent as to the manner in which the timber was to be cut, it will be presumed that the parties contemplated

that it would be cut in the usual and customary manner; hence it was competent to show what was the usual and customary way of doing that work; citing *Walls v. Bailey*, 49 N. Y. 464; *Phelps v. Whitaker*, 37 Mich. 72; *McLennan v. McDermid*, 50 Id. 379; *Machine Co. v. Gaertner*, 55 Id. 453; *Morningstar v. Cunningham*, 110 Ind. 328; *Meriam v. Field*, 29 Wis. 592; *Fornette v. Carmichael*, 41 Id. 200; *Nilson v. Morse*, 52 Id. 240.

2. Evidence of the usual and customary manner of delivering logs at defendant's mill, as to keeping and delivering them in separate lengths, was admissible to aid the court in construing the contract, and interpreting the meaning of the words "particular lengths," as used therein; citing *Tuxbury v. French*, 41 Mich. 7; *Morningstar v. Cunningham*, 110 Ind. 328; Wood, Prac. Ev. § 25, and notes.

3. On the question of the measure of damages, and in support of the charge of the court on that subject, counsel cited *Allis v. McLean*, 48 Mich. 428; *McKinnon v. McEwan*, Id. 106; *Wetmore v. Pattison*, 45 Id. 439; *Petrie v. Lane*, 67 Id. 454; *Pennypacker v. Jones*, 106 Penn. St. 237.

4. If the words "particular lengths" are to be considered as ambiguous, the meaning of the parties was properly shown by proof of their conversation on the subject at the time the contract was made, which evidence did not contradict or vary the terms of the written contract; citing Wood, Prac. Ev. § 25; *Swett v. Shumway*, 102 Mass. 365; *Sampson v. Gazzam*, 6 Porter, 123; *Ganson v. Madigan*, 15 Wis. 144, 154; *Lyman v. Babcock*, 40 Id. 503, 511; *Sargent v. Adams*, 3 Gray, 72.

LONG, J. The plaintiffs began two suits in the circuit court for the county of Bay against the defendant on November 16, 1886,—one by declaration containing the common counts only, and to which declaration was appended a copy of a promissory note given by defendants to plaintiffs on September 2, 1886, for $2,164.11, payable 30 days after date, and the other by summons, in which a declaration containing two special counts and also the common counts was afterwards filed. These two suits were tried as one case.

In these special counts a copy of a contract, dated July 17, 1885, made between Smith & Guilford, plaintiffs' assignors, and the defendant is set forth. This contract provides substantially as follows:

"1. Said second parties [Smith & Guilford] hereby agree that they will skid, haul, and deliver upon the cars of the Michigan Central Railroad Company, at the Ogemaw village switch, at Ogemaw village, Ogemaw county, Mich., all the merchantable white pine logs that said first party shall deem proper for the Saginaw market, situate and being upon sections 21 and 28, town 22, N., range 1 E., Michigan, at and for the price of $2.50 per thousand feet, and also, that they will skid, haul, and deliver at the mill of said first party [Mr. Plummer], at Ogemaw village aforesaid, all the remainder of the white and Norway pine and hemlock standing and being upon said sections, at and for the price of $2.30 per thousand feet.

"2. That they will deliver said logs in sufficient quantities to keep the saw-mill of said first party constantly supplied with logs for sawing purposes at Ogemaw village, and place the same upon skids at said mill, keeping logs of particular lengths by themselves.

"3. That they will deliver of said logs required by said first party for the Saginaw market not less than three million, nor moré than five million, feet between the date of this contract and the 1st day of December, A. D. 1885.

"4. That he will suspend operation from said 1st day of December next until the 1st day of April, 1886, or until said first party shall have time to cut and save such timber as may have been damaged by fire upon lands owned by him in the neighborhood of said above sections.

"5. That he will board the men of said first party engaged in cutting said timber free of cost.

"6. That they will do all such work in a good and workmanlike manner, and use all due diligence in delivering and forwarding the timber intended by said first party for the Saginaw market upon the recommencement of operations in the spring of 1886, and thereafter"

In consideration whereof first party agrees:

"1. That he will pay said second parties for skidding, hauling, and delivering logs intended for Saginaw market, $2.50 per thousand feet, etc.

"2. That he will allow said second parties the use of all the railroad cars and equipments now belonging to said railroad running to and from said lands to do such work.

" 3. That he will cut a sufficient amount of timber from said lands per day to mutually assist said second parties in doing said work, and keep said mill supplied with logs, and that he will keep a sufficient space clear for. the unloading of the same, and take care of such logs, after unloaded, so as not to delay said second parties in delivering the same."

The logs were to be scaled by a competent scaler to be agreed upon by the parties, each party to pay one-half of scaler's wages. This contract was signed by defendant,. Plummer, and by Smith & Guilford.

The defendant pleaded the general issue, and gave notice of set-off, and also notice of several matters of defense.

The parties subsequently entered into a stipulation covering certain matters of account, and showing that the plaintiffs and their assignors had earned in skidding, hauling, and delivering logs, _____ _____$52,570.02

Due plaintiffs for camp supplies and van bills, _____     339.14
For certain items of interest and protest fees, _____·      86.13

Making a total for which plaintiffs were entitled
   to credit of _____$52,995.29
The amount for which it was stipulated the defend-
   ant is entitled to credit is _____$41,890.88

Thus leaving a balance, exclusive of interest,
   prima facie due the plaintiffs according to stip-
   ulation, of _____ _____$11,104.41

In addition to this balance and interest thereon the plaintiffs claimed in their declaration and at the trial damages for the increased expense in skidding occasioned by the manner in which the cutting was done by the defendant, in skipping or moving about from place to place, instead of cutting the timber substantially clean as the work progressed, which it was claimed is the usual and customary manner in which timber is cut upon lands that are being lumbered.

The plaintiffs also claimed damages caused by the alleged failure of the defendant to " keep a sufficient space clear for the unloading " of the logs, and to take.

care of them "after unloaded, so as not to delay said second parties in delivering the same." They also claimed damages for alleged failure of defendant at certain times to cut the timber fast enough to enable them properly to do the work, but no question arises upon this branch of the case. The declaration alleges the assignment of the contract declared upon from Smith & Guilford to the plaintiffs.

Defendant in his notice of recoupment alleged, and insisted upon the trial, that plaintiffs and their assignors did not perform the contract sued upon; that they failed and neglected to load 5,000,000 feet of logs for the Saginaw market before December 1, 1885; that, by reason of the default in the delivering of said logs for the Saginaw market, the expense of handling, taking care of, and receiving them was largely increased; that they failed and neglected to deliver on the cars of the Michigan Central Railroad Company at Ogemaw village all the white pine saw logs suitable for the Saginaw market, but on the contrary delivered logs that were coarse and unsuitable for the Saginaw market, thereby increasing the expense of handling the coarse logs, including the freight, to a large amount; that, by the admixture of the coarse logs with the white pine logs suitable for the Saginaw market, it depreciated the value of the logs suitable for the Saginaw market to a large amount.

That they failed and neglected to furnish a sufficient quantity of logs to keep defendant's mill running, and by reason thereof defendant was compelled to and did shut down his saw-mill at Ogemaw village a large number of times, and was compelled to keep a large crew of men idle, and was thereby unable to put upon the market his said lumber, and was unable to fill his orders or perform contracts entered into by him, and thereby lost great gains and profits; that they did not regard the terms of

said contract whereby they agreed to keep logs of particular lengths upon skids by themselves at defendant's sawmill, but that they piled upon skids at the mill of defendant logs of all lengths, including hard wood, hemlock, and pine, both white and Norway.

That at the time of making said contract, and during its continuance, the defendant was engaged in the manufacture of special bills; that his mill is what is known as a special bill timber mill; that it was in the contemplation of the filling of such special orders that the contract declared on was entered into, and that plaintiffs and their assignors had full knowledge of these facts, and that by reason of their failure to so pile said logs he was compelled to saw his logs into lumber of miscellaneous lengths, and was unable to fill special orders and contracts, and was compelled to cancel numerous contracts and orders entered into by him; that the lumber manufactured from the logs, by reason of being so mixed and sawed into miscellaneous lengths, was rendered almost valueless; that he was deprived of great gains and profits he would have enjoyed had logs of particular lengths been piled at his said saw-mill in separate lengths from each other; that by reason of the admixture of the logs he was compelled to and did ship a large quantity of the lumber green, which brought a much smaller price by reason of having been placed on the market green, and the cost of transportation was greatly increased.

That they did not remove to defendant's mill at Ogemaw a large quantity of saw-logs cut clean by him as they went, but left a large amount, about 2,000,000 feet, on the skids in the woods and on the ground, which by reason of being so left subject and exposed to the weather became rotten, worm-eaten, and greatly damaged; that a large quantity, some 500,000 feet of said logs, by reason of being so left in the woods, was burned by forest fires.

Defendant further claimed that neither plaintiffs nor their assignors built a suitable and proper railroad track and spurs in suitable places, but attempted to construct a railroad track and spurs over which to convey said logs from said land in unsuitable, improper, and impracticable places; that a portion of said railroad track and spurs was abandoned and could not be used; that other tracks and spurs were built in their stead, and that while attempting to operate said imperfect and improperly constructed railroad, large quantities of said saw-logs accumulated along the line of said railroad track and spurs, and were there left and abandoned, and by reason thereof became valueless to defendant.

That the plaintiffs and their assignors failed to properly use and manage a certain steam locomotive belonging to defendant, and included in the terms of the contract declared upon; that said locomotive was injured and damaged; and that in all, by reason of the neglect and failure of the plaintiffs and their assignors, defendant was damaged to the amount of $50,000.

The jury returned a verdict in favor of the plaintiffs for the sum of $11,080.77, and defendant brings error.

The record contains substantially all the evidence in the case. The case was fully submitted by the court to the jury upon the respective claims of the parties for damages growing out of this contract under the special counts of the declaration.

It is now claimed by defendant's counsel that the stipulated amount, aside from these respective claims for damages, being $11,104.41, is so near to the amount of the verdict rendered by the jury of $11,080.77, that it is evidence that the jury did not allow damages to the plaintiffs under their declaration, nor did they allow any damages by way of recoupment to the defendant, in finding the amount of their verdict.

One hundred and fifteen errors are assigned.

The case was very fully tried, and a large number of witnesses examined, and a large amount of testimony taken. The charge of the court is very full and explicit upon the claims of the respective parties.

Some thirty of the assignments of error relate to the refusal of the court to permit certain questions put either upon the direct examination of defendant's own witnesses or upon the cross-examination of plaintiffs' witnesses to be answered, and some 49 of the assignments of error relate to the admission of evidence offered by plaintiffs under objection of defendant's counsel. The other assignments of error relate to the refusal of the court to charge as requested by defendant's counsel and to the charge as given.

At the close of the testimony the defendant requested the court to charge the jury as follows:

"By the terms of the contract between Smith & Guilford and the defendant, dated July 17, 1885, Smith & Guilford were bound to deliver upon the cars of the Michigan Central Railroad at Ogemaw village switch all the merchantable white pine on sections 21 and 28, town 22 north, range 1 east, that defendant should deem proper for the Saginaw market. If, from the evidence, you find that Smith & Guilford or plaintiffs delivered, among the white pine logs that defendant deemed proper for the Saginaw market, against the protest of the defendant, coarse and cull logs that defendant did not deem proper for the Saginaw market, the defendant is entitled to recover such damages as he sustained by reason of such default."

Error is assigned upon the refusal of the court to give this request in charge to the jury specifically. The court, in its special charge to the jury, fully covered this question, and, as we think, very fairly. Among other things, in relation to this part of the case, the court stated to the jury that—

"Under this contract both parties had a duty to perform. Mr. Plummer would have no right to come in here and say, 'I deem certain logs proper for the Saginaw market and certain other logs not proper for that market, but these plaintiffs delivered logs that I deem not suitable for that market,' and claim damages, unless he shows that he had indicated to them in some proper manner what logs he did not deem suitable for that market.

\* \* \* \* \* \* \* \* \* \* \* \*

"If these men, in violation of their contract and their good judgment, and the judgment which they ought to have applied to the distinction which he pointed out to them as their guide, if they disregarded it, and sent logs to Saginaw that they had reason to suppose Mr. Plummer did not deem proper for that market, then they are liable for the consequences and the damages that resulted to him from securing that kind of logs there. But if he left it to the judgment of these men, and these men exercised that judgment fairly and honestly, he must be bound by that judgment. But if they frequently disregarded his directions, and did put timber upon the cars and send it to Saginaw that they knew was not suitable for that market, and knew that he deemed unsuitable, then they ought to pay damages."

It is clear by the contract that defendant was required to designate the logs which were to go to Saginaw. He should do it in such manner as it would be profitable for plaintiffs to work by. If he left it to plaintiffs' judgment, or to the judgment of the scaler or foreman, and gave only a general description, so that it involved judgment, and that judgment was fairly exercised, he could not complain, and we think this part of the charge fully covered all that defendant had any right to ask.

Defendant further requested the court to charge:

"If you find from the evidence that plaintiffs' assignors did not keep defendant's mill at Ogemaw village constantly supplied with pine logs for sawing purposes, the defendant is entitled to all damages sustained by him by reason of such failure."

This the court also refused to give. The claim made

by the notice under his plea does not set forth any particular bills lost. His claim is that he might have obtained orders for special bills. He does not name a single bill which he thus failed to get. The claim is presented in no other than the most speculative way, and does not present a fact to be tried as to damages. The court instructed the jury upon this question, and we find no error in those instructions.[1] The case in principle falls directly within the ruling of this Court in *Allis v. McLean,* 48 Mich. 428 (12 N. W. Rep. 640).[2]

Defendant further requested the court to charge the jury :

"Keeping logs of particular lengths by themselves, in the contract of July 18, 1885, means that logs of different lengths should be placed on skid-ways at defendant's mill, each length separate from every other length; as an illustration, all logs twelve feet in length together, all logs fourteen feet in length together, and so on throughout the various lengths of logs under the contract. If they were not delivered so that logs of particular lengths were kept by themselves, the defendant is entitled to recover all damages sustained by reason of this breach of the contract."

The contention of the defendant is that the random logs, that is logs of different lengths, though cut for bill stuff, should have been separated by their lengths at the mill, and put on different skid-ways at the mill, and

---

[1] The court instructed the jury that if the plaintiffs failed to deliver the logs so as to supply defendant's mill with logs for sawing, according to the contract, they would be liable for any legitimate damage that he might claim in consequence of such non-delivery, but excluded "*loss of profits*" from the consideration of the jury; that if defendant had men permanently employed, and was obliged to and did pay them while thus compelled to remain idle, the amount so paid would be a legitimate item of damage; but that the employés who worked by the day, and who were not paid for such lost time, he could not charge for.

[2] Counsel for appellant cited, in support of defendant's claim to recover as damages loss of profits, *Atkinson v. Morse,* 63 Mich. 276; *Leonard v. Beaudry,* 68 Id. 312.

because that was not done the defendant has suffered damages which he is entitled to recover.

The contract cannot be so construed, and it is apparent from the conduct of the defendant and his employés that no such construction was thought of at and during the time the work was in progress. The logs cut varied in length from 12 to 36 feet, and it would have required 13 different skid-ways at the mill to place separately these different lengths of logs. It was the duty of defendant to provide these skid-ways, and as appears by the evidence only two were provided for long timbers, and defendant's foreman directed them placed on these skid-ways. The language of the contract itself does not bear any such construction. The language in the contract, "keeping logs of particular lengths by themselves," was employed to designate a class, and conveys the same idea as the words "special lengths." If the intent had been to keep each length of logs by itself, that language would have been used. It is an idea easy to express.

The actual business of lumbering, about which the contract was made, does, in fact, make use of two general classes, viz., the usual or customary lengths, which are from 12 to 22 feet, and cut so as to save timber, and lengths which are cut with reference to particular bills or orders. There can be no doubt that it was intended by the contract that the logs for bill stuff should be kept by themselves, and the other classes of logs by themselves. This was the interpretation given by the court to the contract, and we think it is the true construction.

Some contention was had upon the trial, and considerable evidence introduced by each party, under a claim made by the plaintiffs that the defendant, in cutting the timber, did not do so in the usual and ordinary way, but went from place to place, so that plaintiffs were put to large expense in hauling. There is no provision in the

contract as to the manner in which the plaintiffs should do the work, except that it should be done in a workman-like manner, and keep the mill supplied. The defendant was to do the cutting in such manner as to mutually assist the plaintiffs "in doing the work and keeping the mill supplied." Under these terms it was no matter how fast logs were cut, or what kinds. The plaintiffs fulfilled by keeping the mill supplied with every kind of logs, and might elect for themselves which kind to load first, and from what points to work to the best advantage for themselves.

The defendant claimed the right to skip about, cut here and there, and compel hauling in the same way. The plaintiffs denied this, and claimed that it added to the expense in hauling. The contract was made in reference to the work of logging as actually and customarily done, unless it could be otherwise shown by competent evidence. The plaintiffs gave evidence tending to show the custom was to cut clean. The defendant gave evidence tending to show an understanding, before and when the contract was made, to cut as he did. The plaintiffs gave evidence in rebuttal, and the whole question was submitted to the jury by the court in its general charge, and gave the defendant the benefit of this understanding if they so found. We think the matter was fully and fairly submitted to the jury, and the defendant has no reason to complain of this part of the case.

The defendant requested the court to charge:

"If you find from the evidence that defendant, by order of Guilford, paid to Angus Bedour the sum of $615.32 for work done by him for Guilford, under verbal contract between defendant and Guilford, the defendant is entitled to credit for such amount as payment."

The court refused this request, but charged the jury, substantially as follows:

"Here is an amount claimed to have been paid by Mr. Plummer to Bedour for skidding a quantity of logs that Mr. Guilford was under contract to get out. The claim is for payment made by defendant for loading these logs. It is conceded that Mr. Plummer did pay for the skidding and hauling. The only dispute is whether he was authorized to pay it. * * * You may have no sort of doubt that this payment was made by Mr. Plummer, who had no particular interest in paying it to Mr. Bedour, because he so understood his authority and the direction. Mr. Bedour may have received it with that understanding, and it may be supposed, it is suggested, that Mr. Plummer would not have paid this man Bedour unless he thought and believed he was authorized by Guilford to do so. And Guilford's good faith is attested in the same way, to a certain extent. He testified that he paid Bedour, and Bedour received from him, some four hundred and ninety-four dollars of this same amount. What you may think of Bedour for receiving from these two parties double payment for his labor is another question."

The court, in another portion of its charge, stated to the jury:

"Assuming that these witnesses are equally honest, and perhaps you may be satisfied they are, it indicates that there was an entire misapprehension between the parties."

It appears from the record that Plummer and Bedour testified that Guilford authorized this payment, while Guilford denied giving Plummer any such authority. Plummer testified that he paid Bedour $615.32 for loading the logs, and that that amount included nothing but for logs loaded under the contract, and that the payment was directed by Guilford in the presence of Bedour. Mr. Bedour testified that Plummer was at Ogemaw, and that he went down with him to West Branch; that the conductor held the train at his request; that he went to the hotel, and got Guilford to come down to the train, and talk the matter over with Plummer; that Plummer was to pay him; that Mr. Plummer asked Guilford if he should pay Bedour for the work, and he said, "Yes." Mr. Guil-

ford denied making any such statement, or ever authorizing Plummer to pay for loading those logs.

The issue was thus made between the parties, and it was a question of fact for the determination of the jury.

Defendant's claim is that the court voluntarily passed upon one of the most important questions of fact in the case, and clearly informed the jury what his opinion of the testimony upon the payment was; that this statement of the court was a finding of fact that, conceding both parties to be equally honest, they misapprehended each other. Another claim is also made that defendant's case was prejudiced by the remarks of the court upon the witness Bedour, in that the court said,—

" What you may think of Bedour for receiving from these two parties double payment for his labor is another question,"—

As Bedour had testified that he had done other work for Guilford, and that this $615.32 included no part of the other work. Mr. Bedour testified:

" This work I did for Mr. Guilford was on that deal, for sections 10 and 11. I had a separate transaction with Mr. Guilford, apart from that, but this was all done on sections 10 and 11. * * * The payments that I have received from Mr. Guilford and Mr. Plummer pay me in full for all the work I did for Mr. Guilford on sections 10 and 11. It does not overpay me."

It is evident that Bedour's testimony was important upon this $615.32 item. Plummer claimed to have paid it under authority from Guilford; and claimed a credit for it on this account. Guilford denied giving any such authority to Plummer, and further insisted that he had paid that item for the identical work to Bedour himself. Bedour was called by defendant, and gave testimony squarely contradictory to Guilford, and claiming that, while Guilford paid him the $615.32, it

was for other work done for him, and that what he received from Guilford and Plummer only balanced his claim, and he was not overpaid.

The remark of the court,—

"What you may think of Bedour for receiving from these two parties double payment for his labor,"—

Would naturally and necessarily have great weight with the jury. It was an expression of doubt by the court as to the honesty of Bedour for receiving double pay. It must have made 'an impression upon the minds of the jury, which they would carry into the jury-room; and where the case was so evenly balanced between Plummer and Guilford, who so squarely contradicted each other upon the question of the authority for the payment, Bedour's testimony was of much moment, and might be decisive of the question. We think this remark prejudiced the defendant's case upon this $615.32 item.

We think, also, the court was in error in charging the jury that there was an entire misapprehension between the parties upon this question of authority to Plummer to pay the $615.32. The testimony was direct and positive, and plainly irreconcilable, and it was a question of fact for the jury to determine which was right. If Plummer and Bedour were right in their version of it, then Plummer was entitled to the credit, and, if Guilford was correct, the credit should not have been allowed.

In view of the issue made in the case by the pleadings, the court allowed great latitude in the examination of witnesses. We think this was proper, and we find no error in the record upon the reception or rejection of evidence. The case was fully tried and submitted to the jury under a very full and fair charge by the court.

We find no error in the construction given to the con-

tract by the court. The only error we find in the case relates to this $615.32 item, and in the charge of the court upon that subject we think there was error.

The judgment of the court below must be reversed, with costs, and a new trial ordered.

SHERWOOD, C. J., CHAMPLIN and MORSE, JJ., concurred. CAMPBELL, J., did not sit.