### FELL *v.* NEWBERRY.

1. BREACH OF CONTRACT—DAMAGES—LOSS OF PROFITS.

   Loss of profits arising from the breach of a contract may be recovered if they were within the contemplation of the parties at the time the contract was executed, and if they can be determined with a reasonable degree of certainty, so as not to fall within the rule precluding a recovery of speculative or conjectural damages.

2. SAME.

   Defendant, the owner of a shingle mill, entered into a contract with plaintiff whereby the latter was to operate the mill for a specified time, furnishing his own help, and defendant was to supply the mill with timber, and pay plaintiff a stipulated price per thousand for cutting the shingles. Upon defendant's refusal to permit plaintiff to run the mill, suit was brought for breach of the contract. *Held,* that plaintiff was entitled to recover the profits that he might have made under the contract had defendant not prevented its performance. GRANT, J., dissenting.

3. SAME—OVERRULED CASES.

   The case of *Talcott* v. *Crippen*, 52 Mich. 633, was overruled by *Leonard* v. *Beaudry*, 68 Mich. 312, so far as the cases are in conflict.

Error to Emmet; Adams, J. Submitted June 4, 1895. Decided October 1, 1895.

*Assumpsit* by Sylvester C. Fell against Jay L. Newberry for work and labor, and for damages in being prevented from performing a sawing contract. Plaintiff brings error from a judgment in his favor for less than the amount claimed. Reversed.

*Lyon & Dooling,* for appellant.

*B. T. Halstead* and *A. D. Cruickshank,* for appellee.

MONTGOMERY, J. The facts are sufficiently stated in the opinion of Mr. Justice GRANT. The question involved

is whether the plaintiff is entitled to recover as damages
the amount of such profit as he might have made by per
forming the contract if performance had not been pre-
vented by the defendant.

The general and simplest rule of damages is that the
injured party is entitled to compensation for the loss
sustained. In actions on contract this rule is so far
qualified as to limit the recovery to such damages as can
be said to have been in the contemplation of the parties.
A further limitation to the general rule is that damages
which are speculative or conjectural cannot be recovered.
To this class belong profits that cannot be fairly estab
lished by proof, not because the loss of profits should
not be compensated, but solely because of the inability
to estimate or determine the amount. It has been fre-
quently held by this court that when the breach of con-
tract results in the loss of profits to the plaintiff, and the
contract is one in which a profit accruing to the plaintiff
was contemplated, the amount of such profit is recover-
able. *Atkinson* v. *Morse*, 63 Mich. 281; *Leonard* v. *Beaudry*,
68 Mich. 312, 80 Mich. 163; *Burrell* v. *Salt Co.*, 14 Mich. 34.
See, also, 5 Am. & Eng. Enc. Law, 32, note. In the case
of *Allis* v. *McLean*, 48 Mich. 428, it was held that, for the
failure to furnish machinery to the owner of a sawmill
as agreed, the owner could not recover for profits which
he would have made *in the general conduct of the business.*
Mr. Justice COOLEY, speaking of the profits claimed in
that case, said:

"They depend on many circumstances, among which
are capital, skill, supply of logs, supply and steadiness
of labor; and one man may fail while another prospers,
and the same man may fail at one time and prosper at
another, though the prospective outlook seems equally
favorable at both times."

It will be seen that the case of *Allis* v. *McLean* was not
a case in which the plaintiff was proceeding under con-
tract with the defendant or with a third party to manu-
facture at a stipulated price; and in the precisely analo-

gous case of *John Hutchinson Manfg. Co.* v. *Pinch,* 91 Mich.
156, the case of *Allis* v. *McLean* was followed. On the
other hand, in *Leonard* v. *Beaudry, supra,* it was held that
the owner of a sawmill, who was defeated of the profits
which he might have made under a contract with the
defendant, could recover such profits on showing what it
would cost him to manufacture the lumber. We think
the latter case, if followed, rules the present. There is
no element of uncertainty in the present case which there
was not in that. The only difference is that in that case
the amount of lumber to be cut was fixed, while in the
present the plaintiff was entitled to the profits which he
might make by cutting up to the capacity of the mill for a
given time. Breakdowns and interruptions affect the
cost in the one case as well as in the other, but this fact
was not in that case, nor should it in this, be deemed
an insuperable obstacle to recovery. A workman en-
gaged with a team may meet with an accident to his
wagon or break a logging chain, but we apprehend that,
if this be the only element of uncertainty, he would be
entitled to recover the prospective profits of an employ-
ment. The rule ought not to be different in the case of
the owner of a mill. In *Leonard* v. *Beaudry,* 68 Mich. 322,
Mr. Justice CHAMPLIN very pertinently said:

"It is a mistake to suppose that sawmill owners are
without the protection of the law, or that their business
is so hazardous and uncertain that parties dealing with
them can violate their contracts with impunity."

In *Petrie* v. *Lane,* 67 Mich. 454, plaintiff failed to show
that his mill was not as profitably employed during the
season as it would have been by fulfilling the contract.

It may be difficult to reconcile the case of *Talcott* v.
*Crippen,* 52 Mich. 633, with *Leonard* v. *Beaudry,* but, in
so far as the two cases conflict, the latter, it must be
held, has overruled the former.

Plaintiff was entitled to have the jury consider his loss
of profits by the breach of the contract.

Judgment should be reversed, and a new trial ordered.

McGRATH, C. J., LONG and HOOKER, JJ., concurred with MONTGOMERY, J.

GRANT, J. (*dissenting*). This is an action of *assumpsit* to recover for work and labor performed in repairing a shingle mill for the defendant, and to recover as damages prospective profits which plaintiff claims he might have made if he had been permitted to run the mill for six months under a parol contract made with the defendant.

The contract, as stated by the plaintiff, is as follows:

"The arrangement was that I was to go up to Germfask, and see to getting the mill into running order, and, after it was ready to run, I was to run the mill by the thousand, for six months. I was to hire my own help, and he was to pay me for cutting, by the thousand, one dollar for the clear, fifty cents for the seconds, and twenty-five cents for culls. That was Mr. Newberry's proposition. I accepted it at the time I looked the mill over. He was to furnish the mill with stock, and to keep the mill running. He said the parties there with whom he had a contract would stock it, and I said, 'That is very uncertain;' and he said, 'I will see that it is stocked, because I want that mill to run every day until I get my money out of it.' He said the timber was pine, and it would run three-quarters star. Under the arrangement, I was to furnish the oil and the files and the incidentals. I was to employ the hands. Payments were to be made monthly. The amount of shingles were to be counted up at the end of each month, and the payment was to be made the 15th of the next succeeding month. I was to pile the shingles up in the yard away from the fire. When the mill was about ready to operate,—I had the men all engaged at that time,—I had a conversation with Mr. Newberry in reference to getting a filer, one particular man. He said he thought he could get me a good filer, and made an effort of that kind. I had the men all engaged to operate the mill. Some of them had been employed for quite a while before the mill was ready. Most of them, for a number of days, had been ready whenever the mill was ready. They were all engaged

August 14, 1893, and were all there in the neighborhood; handy, where I could find them."

The mill was ready for operation about August 14th. It was then proposed by the defendant to reduce their contract to writing. They disagreed as to the terms. Plaintiff refused to sign the contract prepared by the defendant, insisting that it was not in accordance with their parol agreement, for the breach of which this action is brought.

Plaintiff's testimony on the question of damages is as follows:

"I have no knowledge of my own as to the capacity of that mill, as I came away before the mill was run. Based upon my knowledge of the business and my experience as a shingle maker, with the material such as Mr. Newberry agreed to furnish, I would say the capacity of the mill was from 40 to 50 thousand shingles a day. I saw some of the timber there at the mill. With the timber of the quality it was agreed to be furnished, it would run, I should think, three-quarters stars,—an average of three-quarters stars,—and, of the balance, three-quarters to four-fifths seconds, and the remainder culls, would not be far out of the way.

"Q. Would the proportions of the different classes or qualities of shingles be affected by the manner of manufacturing?

"A. Oh, in a certain degree, yes, sir; but more in timber. It is supposed to be in a workmanlike manner. I know of the skill or ability to manufacture shingles of most of the crew of men that I had employed, and I got the best men I could for that line of business. For band irons, nails, oil, etc., we figure, as a usual thing, five cents per thousand. That has been my experience. Five cents a thousand would cover it thoroughly. I know what wages I had agreed to give those men who were to run this mill for me. On a basis of 40 thousand, my profit would have been from $15 to $17 per day; that is, including myself and son's work."

On cross-examination he testified as follows:

" I have resided in Petoskey about nine years. I ran a shingle mill in Petoskey about two years. It was a

steam mill. The engine in our mill was nothing like as heavy as this mill up there. The power was not so good power. The other machinery was just about the same make, mostly. We ran from 30 to 35 thousand on an average, but we were running cedar at that time; we did not run pine. The capacity of pine is about a third more than it is cedar. It was five or six years ago that I ran that mill. I could not state how many months I ran during the first year. I think we ran it more than half of the year. I do not know how many months we ran it the second year. I employed 12 to 14 men about the mill. Sometimes we ran kind of short-handed, and again ran full-handed; but I am speaking of what it requires to run a mill full. Sometimes we cannot get a man that is capable, very conveniently. It has been here, years before, a difficult matter to get a capable man. When I was in business, it was hard to get capable men some parts of the year. I have operated one out near Charlevoix, something like four or five years ago. It was six miles this side of Charlevoix. That mill burned up after I came away from there. I was employed to take charge of it during the latter part of the time I was there. I went there as a hand in the first place. I worked at different things, mostly cutting off, I think. I was there quite a while during the winter. They had a saw-mill connected with it. We used the same machinery north as we used both at Charlevoix and Petoskey. Since leaving the shingle mill in Petoskey, and up to the time I went up north to this mill in question, I have been in the fish business in the summer time. * * * With my experience of mills, this mill had a capacity of about 40 to 45 thousand per day, with a good crew. That would be a good mill. It depends somewhat on the timber. The output would depend upon the mill, the saw, and the sawyer."

On redirect examination he said:

"Based upon my knowledge and experience in the shingle manufacturing business, and my knowledge and observation of the mill and machinery at Germfask, I would say that, taking that machinery in good order, when getting ready to run, it would run at least 20 to 25 days in the month."

Walter Fell, the plaintiff's son, testified that he had

worked in shingle mills for about eight years, off and on; that he considered this a very good one-machine mill; that, based upon his knowledge of and experience in the manufacture of shingles and the observation of other machines, he would say that the capacity of that mill per day, if properly run, was about 40,000; that the timber furnished was good; that while he was there the mill made from 38,000 to 43,000; that the average was 40,000; that the quality was very good, running not quite three-quarters stars, and the balance about two-thirds seconds and one-third culls. On cross-examination he testified that a good deal of the time they did not run a full day; that the well gave out, which hindered considerably; that a lot of poor whisky had a good deal to do with it part of the time; that several of the crew were inclined to use a good deal of whisky; and that another reason was on account of the stock. On redirect examination he testified that under good management a mill ought to run at least 20 to 21 days a month.

George Howser, a witness for plaintiff, had worked in similar mills four or five years. His testimony is as follows:

"*Q.* You must have some idea, then, of the capacity of that kind of machine?

"*A.* That depends a good deal on timber, a good deal on men, and a good deal on how the mill is put up.

"*Q.* How much would you say was the capacity of this mill up there?

"*A.* Well, I should think that mill, everything in good running order, would cut 40,000 a day right along, average that, kept stocked, and have good machinery, not including stoppages, but just the days it run.

"*Q.* Whether or not, when properly handled by competent men, it would average that day in and day out, month in and month out?

"*A.* No; I don't think it.

"*Q.* How much would it average, including stoppages and everything?

"*A.* Well, I couldn't say for that. It is something that is hard to get at. They are a good ways, in that

country, from a machine shop. A little thing would shut you down for 2 or 3 days. I should say the capacity of this mill up there, with everything in good running order, would be 40,000 a day. I could not tell the number of days the mill did run. There were days I worked that the mill did not run. We had some trouble with the well after we started up; it ran dry; and then we had to dig a trench to the river, and it was a week or 10 days that the mill stood still while we were fixing that. It would cost somewhere in the neighborhood of $22, counting everything, to operate that mill.

"*Q.* How much would the gross earnings of the mill be per day?

"*A.* I have never figured it. Of course, you can't count on breakdowns. Shingle mills never run steady. They break down. The men get full with too much whisky. That is the great trouble with shingle men. A good deal of the trouble up there after the 14th of August was that the men got full. They got too much whisky. The men would go on a tear once in a while, and would not be able to work. The mill, if properly run, would run about 20 days per month, allowing 5 or 6 days to the month for accidents that naturally happen. Of course, we cannot always tell in a mill, but I should think 5 or 6 days to the month would be sufficient to cover all accidents, or rather breakdowns," etc.

On cross-examination he testified as follows:

"I have had charge of mills; run them by the thousand, by the day, and by the piece, and every way pretty near. The manufacture of shingles is not a certain industry at all. I have found it full of chances and possibilities. I have noticed two men who have started out with shingle mills, men who appeared to be of the same qualifications; the one would prosper, and the other would fail. The chances are about the same one way as the other. Whether the man will make money in the operation or not would depend some on the kind of men he had,—whether the men become sick after running the mill, and whether the men are sober and industrious, or the contrary, or the attention or neglect a man would give to the machinery, so as to cause it to break down. If the well fails, the plant stops. The jointer is the main man in the mill. Another accident that would affect the mill, as to whether it would pay or lose, would be the matter

of breakage of machinery. The cost of running that mill was $22 a day. I arrived at that by taking the items, wages, and adding them up, and made a rough estimate of band iron and oil at 25 cents a thousand. We run 10 hours a day during October, November, and December. If there was a break, we stopped. The men all got their pay for the day, and the mill lost it. Of course, I have got on my book the number of hours I worked."

The above is all the material testimony on the part of the plaintiff. The mill was run by the defendant with the same crew that Mr. Fell had engaged. He gave evidence tending to controvert the plaintiff's claim, and to show that during the time he ran the mill, a period of six months, there was an actual loss of $45, and that the cost of manufacturing exceeded the value of all the shingles manufactured.

It requires no argument to show that the damages claimed are purely speculative and uncertain. Plaintiff did not own the mill, did not lose the use of any capital, was put to no expense in employing men, and recovered for his labor in putting the mill in repair. There is no showing that he lost any time from his customary employment. This, therefore, is not a case of idle capital or idle labor. The law in this State does not permit the recovery of prospective profits under the facts of this case as shown by the plaintiff's own evidence. *Maltby* v. *Plummer*, 71 Mich. 588; *Petrie* v. *Lane*, 58 Mich. 527, 67 Mich. 454; *John Hutchinson Manfg. Co.* v. *Pinch*, 91 Mich. 156; *Talcott* v. *Crippen*, 52 Mich. 635; *Allis* v. *McLean*, 48 Mich. 428. The language used in *Allis* v. *McLean*, at page 432, is especially applicable to the present case.

It follows that the circuit judge was correct in instructing the jury that plaintiff was not entitled to recover for the loss of profits.

The judgment should be affirmed.