QUAY *v.* DULUTH, SOUTH SHORE & ATLANTIC RAILWAY
CO.

1. JURY—EXCUSING JUROR FOR CAUSE—DISCRETION OF COURT.

A trial judge may, in the exercise of his discretion, excuse a
juror for cause at any time before the introduction of evidence.

2. SAME—HARMLESS ERROR.

Error, if any, in excusing a juror after he had been sworn, is
not prejudicial, where the cause was submitted to an impartial jury, since this court could not require the cause to
be tried before the jury first sworn.

3. DAMAGES—LOSS OF PROFITS—FIRES—RAILROADS.

The measure of damages for the destruction by fire, set by defendant railroad company's engine, of logs piled along its
right of way for shipment to a mill to be manufactured into
shingles, is the value of the logs plus the rental value of the
mill during the period the owner lost its use through the
burning of his logs; the element of loss of profits being too
uncertain for submission to the jury.

4. RAILROADS—FIRES — NEGLIGENCE — DEFECTIVE SMOKESTACKS —
QUESTIONS FOR JURY.

Whether defendant railroad company's engine was properly
equipped and managed so as to constitute a defense under
the statute (section 6295, 2 Comp. Laws) to an action for negligent fire, *held*, under the evidence, to be a question for the
jury.

Error to Mackinac; Shepherd, J. Submitted January
10, 1908. (Docket No. 31.) Decided July 3, 1908.

Case by Lafayette Quay, George W. Quay, and Edward S. Quay, copartners as D. Quay & Sons, against
the Duluth, South Shore & Atlantic Railway Company
for the negligent burning of certain logs. There was
judgment for plaintiffs, and defendant brings error. Reversed.

*Henry Hoffman* (*A. E. Miller*, of counsel), for appellant.

*Benjamin & Quay*, for appellees.

BLAIR, J. Plaintiffs instituted this suit to recover damages for the destruction by fire of about 300,000 feet of cedar logs alleged to have been caused by sparks from one of defendant's locomotives. The logs were piled along defendant's right of way for shipment over its road to St. Ignace, whence plaintiffs intended to have them towed to Cheboygan for manufacture into shingles at their shingle mill at that place, as defendant understood. The declaration alleged, and the evidence tended to prove, that, in consequence of the burning of said logs, "plaintiffs ran out of stock for their said shingle mill and were therefore compelled to close down their mill about a month before the usual closing time, thereby causing them to lose great profits which they otherwise would have made through the operation of said mill and the manufacture of said logs into shingles."

On the examination of the jury, Mr. Mulcrone, one of the panel, was asked upon his voir dire if he sold any meat to the defendant, to which question he replied: "Yes, I furnish some to their dining cars." A challenge for cause having been overruled and plaintiffs' peremptory challenges having been theretofore exhausted, the jury were sworn, and thereupon (it being Saturday) court adjourned to the ensuing Monday at 10 o'clock a. m. On the opening of court on Monday, and before any testimony was taken in the cause, plaintiffs' counsel announced that it had come to their attention that the juror Mulcrone had a contract with defendant, whereby he furnished to it about $400 worth of meats per month. Against defendant's objection and exception, the court permitted Mulcrone to be re-examined, whereupon he testified: That he had been selling meats to defendant for eight or ten years, and had furnished it some that day. "I furnish them daily for their dining cars on this route." That his bills ran from $300 to $600 a month. "I haven't got any signed contract. They merely buy from me. They didn't sign any contract." Thereupon plaintiffs' challenge for cause was allowed, and Mr. Mulcrone excused,

to which ruling defendant's counsel excepted. The panel having been completed, the trial proceeded, resulting in a verdict for plaintiffs, and defendant has removed the record to this court for review upon writ of error, relying upon the following assignments of error:

"(1) Because of the error committed by the circuit judge in excusing, after the jury had been sworn to try said case, Patrick Mulcrone, one of said jurors, and completing said panel by calling other talesmen, and proceeding with the trial of the cause with this new jury.

"(2) Because of the error committed in admitting testimony against defendant's objection and exception, touching damages other than the value of the property burned, being for damages for losses alleged to have been suffered in the loss of profits that would have resulted in the manufacture of the timber, if same had not been burned.

"(3) Because the circuit judge refused the requests of the defendant to the jury, numbered 1 to 5 inclusive."

1. This point is without merit. As we said in *Scripps* v. *Reilly*, 38 Mich. 13:

"It is the aim and policy of the law to have a fair and impartial jury, and, to this end, it would be the clear duty of the court, up to the last minute, to permit counsel to further examine the jurors."

In accordance with the principle of that decision, we hold that the trial judge may exercise his discretion to excuse a juror for cause at any time before the introduction of evidence. This holding is supported by authority and is in harmony with the policy of the law to secure a trial by an impartial jury. 24 Cyc. p. 314, and cases cited.

Even if it should be held that the ruling of the court was erroneous, we could not correct the error, since we could not require the case to be tried before the jury first sworn. All that the defendant would secure by a reversal for this error would be the right to try the case before an impartial jury, and this it has already had. The error, therefore, would not be prejudicial.

2. The contention of counsel for defendant under this head, as stated in his brief, is as follows:

"The testimony was inadmissible for two reasons: (*a*) Because plaintiffs were not entitled to profits they claimed they would have made in the manufacture of the shingle timber, if the same had not been burned, the proper measure of damages being the value of the timber burned at the time and place of burning. (*b*) Because the alleged profit, as appears from the testimony in this case, was too uncertain, speculative and remote to form any basis for recovery."

The testimony of plaintiff Lafayette Quay, which defendant objected to and moved to strike out, tended to show:

"That the logs were gotten out as part of the 1906 season stock to manufacture into shingles to keep their mill at Cheboygan running. That the mill started up about the 14th of April, 1906, and shut down about the first week in November, on account of having no more timber to run their mill; that if they had had timber they could have run along until Christmas; that they were unable to obtain other logs to replace those burned, although they had been in the market for logs all season; that logs are purchased a year ahead to stock a mill, and that it is very often impossible to obtain stock for a mill in July and August, as the logs are usually placed long before this time; that cedar shingle timber usually grows where it is difficult to lumber in the summer time and has to be lumbered and purchased in the winter time, as cedar is usually from swampy places and close to rivers that cannot be driven during the summer time, and the logs have to be driven in the spring when the water is high; that the only shingle timber he heard of after the fire was some that was brought to Cheboygan by Capt. Perue and which he desired to purchase but Perue would not sell, and, instead, contracted with plaintiffs to have his logs manufactured into shingles at plaintiffs' Cheboygan mill, and which they did so manufacture during the season of 1906; that it would have taken 30 or 35 days to have cut the logs burned into shingles at plaintiffs' mill, running days only, but, running the mill day and night, it would have taken them 18 to 20 days; that, if they had cut these logs into shingles, they would have been able to dispose of them, as they not only sold all the shingles they manufactured that season, but had demand and could have sold three times the amount of their cut; that it would have cost

plaintiffs 75 cents per 1,000 or a little less to load the logs on cars at Allenville, $2 to freight logs from Allenville to St. Ignace; 25 cents a 1,000 to tow the logs from St. Ignace to Cheboygan; that there would not be any loss of logs in towing them from St. Ignace to Cheboygan at that time of year; that there are not many windstorms in July or August to bother; that they were in shelter at St. Ignace before leaving and would not go out in a storm; that never in their experience in towing logs between St. Ignace and Cheboygan did they lose any logs in the lake; that it costs 55 cents per 1,000 to manufacture the shingles at the mill, including loading them on cars.   *   *   *   I know what it costs to manufacture shingles at the mill by figuring it up a good many times—knowing what we cut and figuring the expenses.   We figure it for one day.   We usually figure it up at night whether we are in debt or not, and we figure it up by the week, and then, as we have pay day twice a month, we figure up the expenses of running the mill and that it costs us 55 cents per 1,000 to manufacture them—that includes putting them in the car. This includes the labor of the men employed at the mill and the incidental expenses of band iron, nails, and oil; but that it did not include his own services nor the bookkeeper's services or interest on the investment or taking into consideration any breakdowns.   *   *   *

"*Q.* When you speak of 55 cents per 1,000, you speak of the manufacture of shingles when everything else is running, without any breakdowns or any break or in the way of strikes or any interruptions?

"*A.* No; that is what it costs to manufacture shingles —55 cents a thousand.

"*Q.* If you have a strike, it would cost you more?

"*A.* I don't know.   We never had any."

In *Allis* v. *McLean*, 48 Mich. 428, it was held that for failure on the part of a manufacturer to furnish machinery known to be desired for the purpose of fitting out a mill, such failure resulting in an interruption of the business of the manufacturer and a consequent loss of profits, profits could not be recovered for the reason that the profits of running a sawmill are too uncertain, indefinite, and contingent. They depend on many circumstances, among which are capital, skill, supply of logs, supply and steadiness of labor; that one man may fail while another prospers, and

the same man may fail at one time and prosper at another, although the prospective outlook seemed equally favorable at both times. This case was followed in *John Hutchinson Manfg. Co.* v. *Pinch,* 91 Mich. 156, although upon another point in the case—that is, as to whether rental value of a mill might be recovered under such circumstances—*Allis* v. *McLean* was overruled, but upon the main question, as to whether profits as such were too uncertain and speculative to be recovered, *Allis* v. *McLean* was approved. On the other hand, there is a line of cases beginning with *Leonard* v. *Beaudry,* 68 Mich. 312, and including *Fell* v. *Newberry,* 106 Mich. 542, and *Industrial Works* v. *Mitchell,* 114 Mich. 34, in which it has been held that profits are a proper measure of damages in any case where loss of profits results from the wrong of the defendant, and where such profits can be ascertained with reasonable certainty. In other words, the court has no hesitancy in awarding damages corresponding to profits, but that the only limitation in applying that rule is that they must first have been in contemplation of parties (in case of contract) and that they must not be uncertain. In *Leonard* v. *Beaudry* it was held that where there was a distinct contract to cut a certain amount of lumber at a certain price per thousand, and the owner of the mill had been deprived of the opportunity of performing the contract, the loss to him was the difference between what it would have cost him to perform the contract and the stipulated price, and that such damages were not too speculative. So in *Fell* v. *Newberry,* 106 Mich. 542, it was held that where the owner of timber agreed to furnish and stock a mill, although the amount was not agreed upon, yet that the capacity of the mill could be shown for the time agreed upon, and that the loss of profits in manufacturing such quantity would be recoverable. The same thing was held in *Barrett* v. *Veneer Works,* 110 Mich. 6. We are of the opinion that the proper measure of damages in this case, under our previous decisions, is the value of the logs destroyed plus

the rental value of the mill during the period plaintiffs lost its use through the burning of their logs.   It follows that the court erred in permitting the plaintiffs to recover the profits they might have made from working up their logs.

3.  Defendant's requests 1 to 5, inclusive, required the court to instruct the jury to direct a verdict in favor of defendant, upon the ground that there was no evidence of negligence on the part of defendant; that the undisputed evidence showed that its locomotives were properly equipped; that their machinery, smoke-stacks and fire boxes were in good order; that the screens or nettings used on said engines were of a form, kind, and pattern as good as any that is known, and were suitable for the purpose for which they were used; and that the engines were properly managed at the time and place in question; making a conclusive defense under section 6295, 2 Comp. Laws.   Without reciting the evidence, we content ourselves with saying that the evidence in this case was much stronger to take the case to the jury than in *Dolph* v. *Railway Co.*, 149 Mich. 278, in which case we held that there were questions of fact for the jury upon these questions.

The judgment is reversed, and new trial ordered.

MONTGOMERY, OSTRANDER, HOOKER, and MOORE, JJ., concurred.