27 So.2d 578

### GOODYEAR TIRE & RUBBER CO. OF ALABAMA, Inc., v. GADSDEN SAND & GRAVEL CO., Inc.
### 7 Div. 846.

Supreme Court of Alabama.
Oct. 10, 1946.

Hood, Inzer, Martin & Suttle, of Gadsden, for appellant.

Edw. B. Miller and Roy D. McCord, both of Gadsden, for appellee.

STAKELY, Justice.

This is a suit brought by Gadsden Sand & Gravel Company, Inc. (appellee) against Goodyear Tire & Rubber Company of Alabama, Inc. (appellant) for damages by water to a deposit of moulding sand in the land of the plaintiff. There was a verdict and judgment for the plaintiff. Hence this appeal.

The plaintiff owns about 50 to 60 acres of land containing sand deposits adjoining the land of the defendant on which is located the defendant's manufacturing plant. On the land of plaintiff there is an overburden of dark, sandy loam 6 to 10 inches deep before moulding sand is reached. The moulding sand has a depth of 8 to 12 feet when building sand and gravel is reached. According to tendencies of the evidence water does not damage building sand and gravel but when moulding sand, which is used in pipe manufacture etc., becomes damp or saturated with water, it is worthless while in this condition. Further, according to tendencies of the evidence, if the moulding sand in the present case becomes worthless, it constitutes too great an overburden over the building sand and gravel to justify the expense of its removal in order to get to the building sand and gravel. The only damage sought in the present action grows out of the alleged saturation with water of the moulding sand on plaintiff's property.

In 1936 or 1937 defendant erected a dam on its property with only a ditch intervening between the dam and plaintiff's property. The dam was substantially repaired in 1940 after a break-through. The dam impounded water which formed a pond or lake on defendant's property. It is claimed that the dam was greatly increased in size in the spring and summer of 1942. According to the evidence the dam when completed was 900 feet in length and broad enough across the top to furnish a roadway for an automobile. The complaint consists of two counts to each of which the defendant pleaded the general issue and the statute of limitations of one year. (Report of the case will set out counts 1 and 2, omitting from each the legal description of plaintiff's lands. Count 1 was amended to omit the word "erecting.")

The claim in each count is for damages resulting from a private nuisance. There is no doubt that the reconstructed dam preventing the natural flow of surface waters from plaintiff's lands, as alleged in count 1, is a private nuisance. § 1081, Tit. 7, Code of 1940; Nininger v. Norwood, 72 Ala. 277, 47 Am.Rep. 412; Gulf States Steel Co. v. Law, 224 Ala. 667, 141 So. 641; Mobile & O. R. Co. v. Red Feather Coal Co., 218 Ala. 582, 119 So. 606. Furthermore we think that the reconstructed dam impounding the waters of the pond or lake, as shown in count 2, and resulting in seepage or percolation with consequent damage to adjoining property, is also a private nuisance. § 1081, Tit. 7, Code of 1940; Crommelin v. Coxe, 30 Ala. 318, 68 Am.Dec. 120; Wilson v. City of Bedford, 108 Mass. 261, 11 Am.Rep. 352; 38 A.L.R. 1244; 39 Am. Jur. p. 343. See also Terrell v. Alabama Water Service Co., 245 Ala. 68, 15 So.2d 727.

We think it is further clear that the erection of the dam under the circumstances constituted a permanent nuisance as distinguished from an abatable nuisance. City of Clanton v. Johnson, 245 Ala. 470, 17 So.2d 669; Sloss-Sheffield Steel & Iron Co. v. Mitchell, 161 Ala. 278, 49 So. 851; Crawford v. Union Cotton Oil Co., 202 Ala. 3, 79 So. 299; City of Birmingham v. Flowers, 224 Ala. 279, 140 So. 353; Harris v. Town of Tarrant City, 221 Ala. 558, 130 So. 83; Steinman v. Baltimore Antiseptic Steam Laundry Co., 109 Md. 62, 71 A. 517, 21 L.R.A.,N.S., 885; Vol. 32, Words and Phrases, Perm.Ed., p. 132. Damages for the construction of the dam "are estimated on the hypothesis of an indefinite continuance of the nuisance, and thus affecting the permanent value of the property. In such event, one may not recover in successive suits, but his damages are awarded in solido in one action. * * *." The damages for the construction of the improvement are as though it were permanent for that

is not abatable. But for an improper or negligent maintenance the rule applicable to an abatable condition has application. Harris v. Town of Tarrant City, supra; City of Clanton v. Johnson, supra. While the cause of action for a permanent nuisance arises on construction of the nuisance, the cause of action for an abatable nuisance "does not arise until the harmful consequences occur and each occurrence or recurrence constitutes a separate cause of action."—Harris v. Town of Tarrant City, supra; authorities supra.

 It appears that damages are sought in each count not only from increase in the size of the dam, but also from maintenance of the dam in its increased or enlarged condition. These are separate claims, one growing out of injuries from the nuisance in its permanent condition, and the other out of injuries from its abatable condition. The causes of action are different and should not be combined in one count. Sloss-Sheffield Steel & Iron Co. v. Mitchell, 167 Ala. 226, 52 So. 69; Louisville & N. R. Co. v. Cofer, 110 Ala. 491, 18 So. 110; Iron City Mining Co. v. Hughes, 144 Ala. 608, 42 So. 39.

As demonstrating that the causes of action are different, it is sufficient to point out that, the statute of limitations of one year presents a different defense to each claim. "It is established in this jurisdiction, as appellant asserts as to actions in tort, that separate and distinct torts, inflicting separate and several injuries, each furnishing a separate and distinct cause of action, to which there may be separate and different defenses, may be joined in the same complaint, but should be presented by separate counts. * * *." Ford v. Henderson, 243 Ala. 274, 9 So.2d 881, 882; Higdon v. Kennemer, 120 Ala. 193, 24 So. 439; Alabama Great Southern R. Co. v. Shahan, 116 Ala. 302, 22 So. 509. The statute runs from the time of the construction of the permanent nuisance but runs from the infliction of the injury when the nuisance is abatable. Harris v. Town of Tarrant City, supra. Each count was subject to demurrer in this regard.

 It is also urged that each count lacks certainty in its allegations of time. It will be noted that the allegations of time with reference to the construction of the dam are neither under a videlicet nor is there anything to show that the plaintiff is unable to be more exact in the allegations of time in this respect. The suit was filed on May 28, 1943. In count 2 the allegation shows that the reconstruction was "in the spring and summer of 1942." This allegation shows that the reconstruction was a continuous operation and since the work was completed within one year of filing the suit, we think the allegation good. But in count 1 the allegations show that the dam was reconstructed "at various times during the spring and summer of 1942." Construing the allegations against the pleader, it appears that on each reconstruction there was erected a permanent nuisance and under the allegations some of these changes could have been prior to one year before filing the suit. We think that the allegations in the first count are bad as against the demurrer. Corona Coal Co. v. King, 204 Ala. 223, 85 So. 479; Corona Coal & Iron Co. v. Bryan, 171 Ala. 86, 54 So. 522, Ann.Cas.1913A, 878; Howton v. Mathias, 197 Ala. 457, 73 So. 92; Shields v. Sheffield, 79 Ala. 91; Phillips v. Ashworth, 220 Ala. 237, 124 So. 519.

Appellant vigorously insists that under the evidence it was entitled to the affirmative charge on each count because of the bar of the statute of limitations of one year. In view of what we have said we do not think it is necessary to discuss this feature of the case further, because when the pleadings are amended to meet our views, the nature of the cause of action will be apparent, and the time when the bar will be complete will be reasonably capable of ascertainment, at least according to the plaintiff's version of the case.

 It will be helpful on another trial to refer to a further contention of appellant on its request for the affirmative charge as to count 1, which was refused. Count 1 is based on the theory that the plaintiff as owner of the upper land has the right to the uninterrupted or natural flow of surface water over and across the lower land of the defendant. The allegations of this count in substance show that

defendant's dam built on defendant's property prevented rainwater from flowing from plaintiff's property, causing the water to accumulate and stand on plaintiff's property, thereby damaging plaintiff's deposit of moulding sand located on this property.

The proof showed that the dam constructed by the defendant on its property adjoining the plaintiff's property created a pond or lake on defendant's property and T. S. Griffin, Vice President and General Manager of plaintiff, in testifying about the pond or lake and how the sand became saturated with water gave the following replies to the following questions:

"Q. Well, how does the water get out then? A. Soaks up in the ground.

"Q. Soaks up? And you claim it soaks down at the bottom and soaks up in your land? Is that your claim? A. That's what I claim, yes sir. Goes out of their land into mine. * * *

"Q. And that's the only way it could do it, is by soaking? Isn't that what you called it? A. Sure."

It is obvious that the proof does not support the allegations of count 1 because it does not show an obstruction of the natural flow of water from the plaintiff's property to the defendant's property, but on the contrary shows an impounding of water in the pond or lake on the defendant's property with subsequent seepage or percolation from defendant's property to the sand located on plaintiff's property. The defendant was entitled to the affirmative charge on count 1 which it requested.

■ As an aid to further proceedings one matter remains which we think calls for discussion. The proof of the plaintiff tended to show that the land with the moulding sand in merchantable condition, was worth $2500 to $5000 per acre, but with the moulding sand ruined from saturation with water, was only fit for farming and worth $25.00 per acre. The plaintiff over the objection of the defendant introduced in evidence a contract between the plaintiff and one Huff whereby plaintiff leased to Huff 25 acres of its land with the right to mine and remove moulding sand, for which Huff agreed to pay a royalty to plaintiff of 15¢ for each cubic yard of sand removed, with an agreement to pay a minimum royalty on a basis of 200 cubic yards of sand at 15¢ per cubic yard, for each month, in the event no sand was mined. The proof tended to show that Huff abandoned the contract because of the wet condition of the moulding sand. Of course if plaintiff was entitled to damages for permanent injuries to the land, the measure of damages would be the reasonable value of the lands immediately before and immediately after the injury. Sloss-Sheffield Steel & Iron Co. v. Mitchell, 181 Ala. 576, 61 So. 934. If the injury resulted in total destruction of the estate and damages for such permanent injury were allowed, loss of profits could not also be allowed (Beam v. Birmingham Slag Co., 243 Ala. 313, 10 So.2d 162; 17 C.J. p. 794; 25 C.J.S., Damages, § 44), especially in a case of this kind where sand removed in mining brings about such depletion as to be in effect destruction of the corpus of the estate.

■ Evidently the Huff contract was introduced in connection with proof of temporary damage for improper maintenance of the dam. Tendencies of the evidence showed that defendant from time to time pumped water from the Coosa River to its manufacturing plant and then emptied part of that water out into the pond or lake, which so increased the volume of water in the pond or lake, despite the presence of spillways in the dam, as to result in recurring seepage or percolation. In speaking of injuries not permanent, but reparable, this court has said:

" 'So far as these damages are concerned, the true measure of plaintiff's damages was the reasonable expense of restoring the premises and the loss of income pending their restoration with reasonable effort, expenditure, and expedition.' Sloss-Sheffield Steel & Iron Co. v. Mitchell, 161 Ala. 278, 49 So. 851. On the former appeal in this case it was said: 'Of course plaintiff was not entitled to recover more than his actual damages on account of loss of rents. We think the difference between the reasonable rental value of the lots and houses with and without the overflow,

during the period covered by the suit, is the correct measure of such damages.' * * *." Sloss-Sheffield Steel & Iron Co. v. Mitchell, 181 Ala. 576, 61 So. 934, 936.

In the Mitchell case the damage was to surface rights, while here the damage is to moulding sand beneath the surface, which makes the situation more difficult to analyze. In the present case mining operations under the Huff contract have ceased and plaintiff still has the moulding sand in the land. We cannot measure the damage by the difference between the rental value of the moulding sand in the land before and after the overflow, as was done in the Mitchell case, because obviously the moulding sand in the land has no rental value. Royalties for sand mined and removed are not rentals but are in effect a price to the owner because such royalties contemplate permanent surrender of the property. The lost royalties are not the criterion because when the sand dries out the owner still has the moulding sand in the land and still has the right to dispose of it on a royalty basis. It can hardly be said the loss of profits is the criterion because how can loss of profits be determined without speculation or uncertainty? Southern Railway Co. v. Coleman, 153 Ala. 266, 44 So. 837.

In the case of Southern Railway Co. v. Coleman, supra, the suit was to recover damages for the loss of use of a ginnery. The proof showed that the ginnery had no rental value and loss of profits was speculative or contingent. This court held that under the circumstances the measure of recovery was interest on the value of the ginnery for the period during which the plaintiff lost its use. Accordingly, we think that the right of recovery here for temporary damages is interest on the value of the moulding sand in the land during the period covered by the suit. See also Southern Iron & Equipment Co. v. Holmes Lumber Co., 164 Ala. 517, 525, 51 So. 531; Kinney v. Glenn, 240 Ala. 202, 198 So. 256. In determining the value of the moulding sand in the land it seems to us that the Huff contract is a circumstance which can be considered along with other evidence in determining such value. Sloss-Sheffield Steel & Iron

Co. v. Mitchell, 181 Ala. 576, 61 So. 934; Warrant Warehouse Co. v. Cook, 209 Ala. 60, 95 So. 282; Southern Ry. Co. v. Bailey, 220 Ala. 385, 386, 125 So. 403. Accordingly the Huff contract is admissible in evidence for this limited purpose.

Reversed and remanded.

GARDNER, C. J., and FOSTER, LAWSON, and SIMPSON, JJ., concur.