SEARS, ROEBUCK & CO. *v.* CREEKMORE.

(In Banc. Sept. 24, 1945.)

(23 So. (2d) 250. No. 35893.)

Snow & Covington, of Meridian, for appellant.

52

L. P. Spinks, of DeKalb, Walter Broach, Jr., of Meridian, and W. E. Morse, of Jackson, for appellee.

54

Argued orally by **E. L. Snow**, for appellant, and by **W. E. Morse** and **L. P. Spinks**, for appellee.

**Alexander, J.**, delivered the opinion of the court.

Suit was brought by appellee against appellant for damages suffered in the loss of his home and its contents by fire allegedly resulting from the negligence of appellant's agent.

Plaintiff's wife purchased from the defendant's store at Meridian some linoleum as a floor covering for the kitchen. The contract included complete installation. Defendant's regular employee who ordinarily laid such coverings was not then available and defendant engaged one Burley to do the job. Upon arrival at plaintiff's home in De Kalb in an adjoining county, Burley requested that the kitchen be heated inasmuch as the weather was too cold for a satisfactory manipulation of the material. Accordingly a gas stove and a water heater which were then lighted were allowed to remain in operation. It was therefore an essential incident of his work to maintain such heat. Whether after the material had become pliable, he should shut off the gas or improvise some other method while putting the flooring down, or should slit the material rather than move the stove, was addressed to his own judgment. To an admonition to cut off the gas supply, Burley assured them that "I can manage it all right, don't worry." He further stated that he had been in such business for twenty years. He requested and was furnished a wrench and moved the stove after disconnecting it from its fuel system, a gas tank in the yard. The gas supply was not cut off, but at his request he was furnished a wet cloth with which he plugged the open end of the fuel pipe and proceeded with his work. When he had completed laying of the strip beneath the stove, the improvised plug in the pipe was removed and Burley attempted to reconnect the pipes while the gas pressure was still present. Escaping gas, ignited unquestionably by the pilot light of the water heater, burst into flames. Despite confused efforts to suppress the flames, they spread until the home and most of its contents were completely destroyed. In trepidation Burley fled the scene and did not witness the holocaust.

Suit was filed against Sears, Roebuck & Company and Jack Burley on account of such damages, and there was verdict and judgment for plaintiff in the sum of $13,000. Only the corporation appeals.

Appellant assigns as error the refusal of the trial court to grant it a peremptory instruction upon the theory that Burley was not its agent but an independent contractor. We are unanimous in our view that the relationship was one of agency and not of independent contractor.

The point is further made that even if Burley was the servant of the appellant, he was not, in respect to the activities out of which the injuries and damages arose, acting in furtherance of the master's business nor within the scope of his authority. The argument, simply put, is that Burley was not employed to disconnect stoves but to lay linoleum. This would unquestionably be true if the laying of a floor covering entailed no incidental acts of preparation or adjustment. But the matter is not that simple. The floor must first be cleared and cleaned. The small quarter-round strip at the bottom of the baseboard had to be temporarily removed. The record confirms our assumption that linoleum is not laid down with a casual and final gesture as one lays down a card. There was here required such preparatory procedures as cutting the linoleum to fit, treatment of the floor with cement and the adjustment of the covering to the irregular pattern of the floor, and a final smoothing out with a pressing device. To this end Burley was equipped with many tools including scissors, knives, hammers, rollers, files, screw drivers, screws and nails. For some years he had carried his own pipe wrench but discontinued the practice, as he claims, because his talents were ofttimes unreasonably and unprofitably exploited.

Burley was of course acting with full authority in laying linoleum. Such activity was not merely in the course of his employment; it was his employment. Since no one can lawfully be employed to commit negligent acts, liability respondeat superior necessarily arises out of tortious conduct committed while the servant is undertaking to fulfill a particular employment. Such tortious conduct consists not in doing the thing for which he was employed but in doing the job in a manner or by means

which constitutes negligence. The mere fact that he is not employed to be negligent does not at all mean that such tortious acts are outside the scope or course of his employment. A. L. I., Rest.; Agency, secs. 228, 229, 230.

There was no obligation upon Burley to disconnect the stove. He could have refused to disengage it, yet because it lay athwart the course of his employment he asked for and procured the wrench to dislodge it. He was serving his own convenience in making his prescribed course easy of accomplishment. Plaintiff did not care that the stove be moved. It served no useful purpose to him, nor did he undertake to disconnect it himself or request Burley so to do. He suffered it and Burley undertook it as an incident to the particular employment. Here indeed is the measure of the scope of the servant's employment. The particular act may not of itself be that for which he was engaged. Yet it may become an incident to that ultimate purpose which constitutes his job.

Our Court has thus included within this scope those acts which are "incidental to the authorized conduct." Miller v. Teche Lines, Inc., 175 Miss. 351, 167 So. 52, 53. Again the test has been stated to be whether the act "was done in the course of and as a means to, the accomplishment of one of the purposes of (the) employment, and therefore in the course of and in furtherance of his master's business." Alden Mills v. Pendergraft, 149 Miss. 595, 115 So. 713, 714. The latter case dealt with a personal assault by the servant and thus constitutes an instance where argument of a diversionary activity would acquire greatest weight. But here the criterion was "if the act complained of was in furtherance of the master's business, and within the course of the servant's employment, the master will be liable therefor, although it was in excess of the authority conferred by the master on the servant . . . and was willfully and maliciously done." See also Richberger v. American Express Co., 73 Miss. 161, 18 So. 922, 31 L. R. A. 390, 55 Am. St. Rep. 522.

Burley was not of course employed to move stoves, nor for that matter to drive trucks. Yet, both activities were undertaken by him as a necessary incident to the ultimate accomplishment of his prescribed task. In disconnecting the gas pipes, he had not abandoned his employment and gone about some purpose of his own. Such test was applied in Barmore v. Vicksburg, S. & P. R. Co., 85 Miss. 426, 38 So. 210, 211, 70 L. R. A. 627, 3 Ann. Cas. 594, where it was stated: "Watson (the servant) was no mere sentient tool, with no power to exercise judgment or discretion as to the time or manner in which his duties should be performed. He was intrusted with the performance of a certain duty, but the details of his service were not regulated or prescribed by . . . any superior, but left solely to his own uncontrolled judgment."

As stated, Burley had no purpose of his own in disconnecting the stove. Plaintiff had even less interest in disturbing the status quo. He did not employ nor request Burley to move it, nor did he incur any obligation to Burley for the latter's labor in disengaging it. The literal course of Burley's employment led him over the spot where the stove stood. It was not his destination but an obstacle along his prescribed course. He did nothing to alter or benefit the permanent condition of the stove. He was looking through it to the goal of his employment —the laying of linoleum.

The servant was not, nor was he employed as, a plumber, chauffeur or carpenter. Yet he performed tasks calling for the exercise of each of such occupations as he followed the course of his employment to its destined and directed end. So that the injury occurred while the servant was engaged in the task of laying floor covering rather than while pursuing a purpose to tamper with stoves. In this connection, Burley disavowed any expert capacity as a plumber. He engaged in no gas fitting or

plumbing business. Yet he affected to know from long experience how to handle gas fittings and kitchen equipment and for years carried equipment and tools adapted to these ends. By his own statement, he acquired this proficiency as an incident of the requirements of his own special vocation of laying linoleum. It is here that Loper v. Yazoo & M. V. R. Co., 166 Miss. 79, 145 So. 743, 745, becomes pertinent. After recognizing the rule that unauthorized conduct is not necessarily outside the scope of employment provided it is "incidental to the conduct authorized," we stated that the ultimate question is whether the act was "something within the ultimate objective of the principal, and something which it is not unlikely that the servant might do." See also A. L. I. Rest., Agency, cited above.

Cases of the tenor of Singer Sewing Machine Company v. Stockton, 171 Miss. 209, 157 So. 366, and Primos v. Gulfport Laundry & Cleaning Co., 157 Miss. 770, 128 So. 507, extend the rule further than is required by the facts here. If if were not possible and often necessary for a servant to deflect his attention momentarily from the narrow point of his objective, or to digress from a straight course of progress toward his ultimate aim, there would have been no need to broaden the area of responsibility by using the phrase "scope" of employment. Within this circle or scope which lies about the narrow target of his aim lie the incidental activities whose pursuit lead the servant in directions which too briefly viewed seem at variance with his true course but which tend in their spiral course toward the ultimate or center. So long as he is tethered to the center post of duty, he may deploy himself in any direction so long as he keeps an eye fixed upon the job at hand. The length of this radius or the area of the circle can not be fixed. The formula for its computation is found however in the Loper case, supra. There was no digression here, as in

the two cases just cited in the sense that there was sought some purely personal purpose. A commingling of the business of the master and the private diversions of the servant was held not to obscure or dilute the master's responsibility so long as there were present and recognizable ingredients of "scope" and "furtherance." Certainly it was without benefit or satisfaction to Burley to pause along the course of his employment and bother with appellee's stove. Through the entire operation there remained a persistent purpose to which these activities were purely incidental. By their very inconvenience there was emphasized their relation to his objective. The only purpose he could and did have was to facilitate his authorized employment. Thus is emphasized that this temporary digression was not an end but a means, and the acts pursued in removing it from the course required by his employment did not carry him outside that restricted zone of responsibility referred to as the "scope of his employment."

Such cases as Craft v. Magnolia Stores Company, 161 Miss. 756, 138 So. 405, by their very inapplicability here, illustrate the principle involved. It was held that the master was not liable for the slander by its servant of a third person while searching for stolen goods. The reason was simple. It was not within the scope of the servant's employment to search for goods stolen. When therefore he by one digression abandoned the prescribed course of his employment, and thereupon further deviated along a by-path of personal malignity, he was found too far afield for identification. In the instant case, this factual issue was properly resolved by the jury. We therefore affirm the finding of liability against appellant.

The verdict was in the sum of $13,000. The losses included the house and furniture and personal belongings. The total of the last two items as claimed by plaintiff was $6,555.60. Since this was the maximum appraise-

ment of the personalty, the jury's valuation of the house was therefore at least $6,444.40. There is no competent evidence to support such a figure. The house was assessed at $1,000. The house and lot cost $1,250 in 1915. Since that time there had been periodical and substantial improvements thereon. One witness fixed the value of the house at the time of and just before destruction at $3,500 and another witness at $4,000. Plaintiff introduced a qualified contractor who testified, over objection, that upon plans reproduced by an architect he would make a "bid" upon the cost of replacement in the sum of $9,308.92. It was therefore solely by reference to this estimate that the jury could find any basis for fixing its value above $4,000.

In case of total and tortious destruction of a house by fire, the basis for computing damage to the owner is a comparison of the value of the whole property before and after the fire. 15 Am. Jur., Damages, sec. 109, p. 517; 25 C. J. S., Damages, sec. 85, p. 608. This is and should be the general rule. Admittedly cases arise in which other factors are found which must be taken into account. Conceivably the lot may be worth more without the structure than with it. See Kaw Feed & Coal Co. v. Atchison T. & S. F. R. Co., 120 Mo. App. 498, 107 S. W. 1034; Murphy v. City of Fond Du Lac, 23 Wis. 365, 99 Am. Dec. 181. Again the house may be an inconsequential item in the total valuation of a large tract on which it is located so that the value of the entire property is not substantially changed, yet there is damage in its loss. Some authorities attempt to value the house apart from the lot while others follow the more practical and safer rule to consider the house and lot, at least where it is urban residence property, as an entity. It would not be helpful to enlarge our opinion with the authorities supporting these exceptional bases.

We do not pursue the distinctions arising out of the expressions "market value," "intrinsic value," or "fair cash value." Property may have a determinable intrinsic

or cash value wholly apart from the existence of an active market upon which quotations are regularly made. Nor do we hold that an estimate of replacement cost is never relevant. It may in a proper case become an aid in computing actual value. Since replacement cost may fail to take into account depreciation upon the destroyed building, and moreover assumes that the plaintiff desires or requires replacement, it furnishes at most only a guide to the application of the "before and after" rule. An expensive house in an inaccessible or undesirable location may be worth less than its original and much less than its replacement cost. For this reason replacement estimates have in many cases been limited to the diminished market value when the latter is less. See Alesko v. Union Pacific R. Company, 62 Idaho 235, 109 P. (2d) 874; Givens v. Marshall, 51 Cal. App. (2d) 374, 124 P. (2d) 839; 15 Am. Jur., p. 518.

We hold therefore that where, as here, the property destroyed is an urban residence, the proper basis for estimating damages for complete destruction is the value of the entire property before and after the loss.

The principal instruction for plaintiff authorized the jury, upon a finding of the prerequisite facts showing liability, to find for the plaintiff "in such sum or sums as would compensate him for the damages sustained, as shown by a preponderance of the evidence." Taken in connection with plaintiff's evidence of replacement costs, admitted over objection, it failed to furnish the jury with the proper basis for estimate and constituted reversible error. See Greenwald v. Yazoo & M. V. R. Co., 115 Miss. 598, 76 So. 557.

We find no error in allowing suit by the plaintiff as owner, to whom had been assigned the claims of the other occupants. Burke v. Louisville & N. R. Co., 7 Heisk., Tenn., 451, 19 Am. Rep. 618.

Affirmed as to liability, and reversed and remanded for hearing upon the issue of damages only.

**L. A. Smith, Sr., J.**, delivered a dissenting opinion.

Very deferentially and very respectfully I dissent from the conclusions of the controlling opinion in this case, as to liability. In my judgment the appellant was entitled to and should have been granted a peremptory instruction. The negro Burley perpetrated the acts resulting proximately in the fire, not as the agent of appellant but as the agent and by the assistance directly of appellee, so that liability for such extraneous acts beyond his appointed powers should and could not in good reason and fairness be imposed upon appellant.

It is contended that because the linoleum had to be warmed it was necessary to leave the gas fixtures in operation for a time, although it could have been warmed in the bathroom. It was argued that its disconnection and removal was as a consequence a mere incident to the laying of the linoleum, and hence it was dealt with in the scope of employment of appellant's servant. As I understand the word "incident" or "incidental," the meaning is something appertaining to a purpose. Webster defines it thus: "Something necessarily appertaining to or depending on another, which is termed the principal."

In the conversation between Mrs. Creekmore and the salesman of appellant, she merely purchased the linoleum and the service of laying it on the kitchen floor, a simple operation, to which appellant agreed. There was nothing in the conversation to the effect that the kitchen fixtures involved a system employing the highly dangerous and volatile gas, butane. There was nothing said about this fixed equipment having to be disconnected and removed and replaced. Certainly, in my judgment, this hazardous operation was not incidental to the laying of the linoleum. These appliances were rigidly affixed, and appellant's servant was not a plumber, carried no tools suitable to disconnecting and refixing these fixtures, and hence it cannot be maintained that such a situation was in con-

templation of appellant when the trade was made with Mrs. Creekmore. It cannot be successfully maintained moreover in my opinion, that disconnecting and reconnecting these highly hazardous fixtures for the use of this explosive element of butane gas was an incident or necessarily appertaining to the laying of linoleum on a floor.

Suppose, when this negro reached the home of Dr. Creekmore, he had found a plank missing in the floor of the kitchen, or one that was warped out of position so that it had to be ripped out and realigned and evened with the rest of the floor before the linoleum could be laid—can it be successfully argued that this negro layer of linoleum, as an incident to the laying, would have to do the carpenter's work involved before laying the floor covering? That is the work of a carpenter, just as the extraneous and difficult work of removing and replacing the fixtures here was the work of a plumber. These articles were fixtures, not loose pieces of furniture that could be easily shifted from place to place in the kitchen as the work progressed. It is no answer, I think, that the quarter rounds had to be removed so the uneven edges of the linoleum could be concealed by their replacement, as a matter of common knowledge it is customarily necessary to a workmanlike job of laying the linoleum, and a part of it. But disconnecting and reconnecting plumbing fixtures containing highly volatile and explosive gas from and to their firmly fixed metallic connections is another thing, and difficult and requiring special skill not represented by appellant to have been possessed by this negro.

In my opinion, therefore, this extraordinary additional service, the co-labor of both appellee and appellant's servant, cannot be said reasonably to be one which might have been contemplated by a reasonable person as incidental to the service of laying linoleum, when only the sale and laying of the linoleum was asked and promised by the respective contracting parties.

It follows that it is pertinent to inquire whose agent was this negro in his handling of these fixtures and this butane gas, highly hazardous if released from its confinement in pipes and containers? He demurred to doing it, but with the assistance of Dr. Creekmore, from whom he borrowed the necessary tools, he undertook to do it, because, as he stated, he did not want to vex appellee, or words to that effect. Dr. Creekmore's wife was in a hurry to have the work completed ahead of the arrival of guests, and this negro was aided by Dr. Creekmore in proceeding with work beyond the laying of linoleum, and for which the doctor furnished the tools, all of which in the subsequent course of events led to the burning of Dr. Creekmore's house. Had the negro's reasonable protest been heeded, there is nothing in the record to support any conjecture otherwise than that the house would not have burned. In my judgment, this negro was doing work not necessarily incident to laying linoleum, and acting, therefore, beyond the scope of his employment; and was aiding in the joint doing thereof by appellee, so that in the doing, he was the agent of appellee, and not of appellant, and hence the latter is not liable. In this connection, the maxim, ''qui facit per alium facit per se'' is applicable, I think, to the actions of appellee on this occasion in his dealing with this negro.

The testimony of the negro, Burley, as to what happened is:

''Q. Who got the tools with which to unhook the pipe? A. Doctor got them. I didn't have a pipe wrench. We had some, I don't remember not the whole story of it, we had some objection about the stove. I didn't show any contempt being up here. It is my will to try the best I can to satisfy people. I knowed the stove was out of my place to take out. I said to Doctor, 'If you have got a pipe wrench I will take the stove out, provided if you will help me.' He said, 'I will help.' Me, I may not have said provided you give me help.''

Dr. Creekmore also said he helped him.

It is elemental, as held by this Court in Davis v. Price, 133 Miss. 236, 97 So. 557, that a master cannot be held responsible for a tort committed in furtherance of his business, unless it is shown to have also been committed in the course of the appointed duties of the tort feasor. This negro's will was permitted in this case to extend his own services, for his own reasons, but did not co-extensively enlarge the liability of appellant for such additional services. They were the decision of the negro, carried out with the help of the appellee, and not appointed by the appellant or anticipated. The negro's judgment should not be permitted in this matter to enlarge the scope of his employment by appellant. He was cooperating with appellee, to avoid showing him contempt, as he said, or to accommodate him.

In Shell Petroleum Corp. et al. v. Kennedy, 167 Miss. 305, 141 So. 335, we held that the judgment of an employee could not extend the liability of his employer beyond the appointed scope of his employment, even where, if success had attended employee's judgment it eventually might have in a degree furthered the master's business.

I think here clearly the negro Burley was not acting in discharge of his appointed duties to appellant, but was acting as the agent of appellee, in doing the precise and particular things proximately resulting in the fire which destroyed the house, and I therefore respectfully dissent accordingly.

**Griffith, J.**, and **Sidney Smith, C. J.**, concur in this dissent.