MISSISSIPPI POWER COMPANY, et al. *v.* HARRISON

No. 42566        May 6, 1963        152 So. 2d 892

*Eaton, Cottrell, Galloway & Lang,* Gulfport; *Deavours & Hilbun,* Laurel; *Watkins, Pyle, Edwards & Ludlam,* Jackson, for appellants.

*McFarland & McFarland*, Bay Springs, *Heidelberg,* *Woodliff & Franks, Wells, Thomas & Wells*, Jackson, for appellee.

McELROY, J.

This is an appeal by the Mississippi Power Company, defendant in the court below, from a final judgment of the Circuit Court of the Second Judicial District of Jasper County, rendered in favor of Lee Harrison, Jr., plaintiff, in an action for damages for the destruction by fire of a hatchery building and the contents thereof owned by the plaintiff, as a result of the negligence of the defendant power company. The plaintiff claimed a total loss in the amount of $78,496.50. The jury returned a verdict in the amount of $68,496.50, and judgment was entered for that amount.

The amended declaration alleges that on or about the 10th day of August, 1961, the hatchery located on Highway No. 15 in the town of Bay Springs, Mississippi, owned by Lee Harrison, Jr., burned and was totally destroyed. The fire occurred at approximately 1:00 a.m.

Appellee claims that on the identical lines claimed to have started the fire which destroyed Mr. Harrison's hatchery on August 10, there had been a tremendous electrical disturbance on July 12, 1961 in which some wires burned in two due to limbs falling across them. This occurrence was twenty-eight days before the fire in question. Appellee further charged that the lines were not properly equipped and did not properly function to cut off the current in the event of an unusual disturbance, and that the defendants had direct notice of this condition by the occurrence of July 12; that on August 10 at 1:00 a.m. the same lines that were involved in

the electrical disturbance of July 12, 1961 again were involved in a tremendous electrical disturbance to the extent that the lines were transmitting open and visible balls of fire back and forth across Highway No. 15 and into the line going into the hatchery building; that this was openly visible to a number of people, and after the occurrence continued for a short while, the property of the plaintiff was set on fire; and that this fire was due to these faulty electrical conditions transmitting the energy into the building. Appellee charges that the transformer, which was located immediately adjacent to the hatchery was defective. This was shown by the fact that the defendants on the same morning of the fire put in a completely new transformer and all lines and equipment connected with it. Proof of this was shown by the fact that the lines running across Highway No. 15 were completely destroyed and burned in two by the fire running along the lines, and that the plaintiff's agent attempted to keep a part of this line for exhibition before this court and the jury, but was denied this right and privilege by the defendant.

Appellee sums up all the charges as follows:

A. The defendants failed to properly maintain the high voltage electrical lines in close proximity with the plaintiff's place of business so as to prevent the lines from coming in contact with each other.

B. The defendants failed to properly maintain the high voltage electrical lines in close proximity with plaintiff's building so as to prevent the line from arcing and carrying into plaintiff's building the agency, the fire, that burned plaintiff's place of business.

C. The defendants failed to provide the proper circuit breakers or fuses which would cut off the electricity from the lines when they came in contact with each other on plaintiff's property or in close proximity to his hatchery building.

D.  The defendants failed to properly maintain the lines by insulating same, so as to protect plaintiff's property from the lines when they came in contact with his property.

Plaintiff charged that the acts of negligence of the defendant were the direct and proximate cause of the fire which destroyed the building.

Plaintiff further alleged that in itemizing his damages each item was charged on the fair market value thereof, and the fair market value was arrived at by using the replacement cost less the proper depreciation on each item. Plaintiff attached Exhibit "A" (the itemized list of the building, equipment, and contents of the building so destroyed) to his declaration. Exhibit "A" consists of some thirty items destroyed in the fire. The main items in this exhibit which the Court will consider are as follows:

1 Comb Setter & Hatching Streamliner Incubator, purchased 1954, original cost, $11,627.00, value, $6,976.20.

1 Comb Setter & Hatching Streamliner Incubator, purchased 1958, original cost, $11,627.00, value, $9,882.95

7 Jamesway Incubators, purchased 1959, original cost, $14,079.51, value, $12,671.25

1 Building, built 1951, original cost, $16,935.50, value, $10,161.00

Baby chick replacement for eggs burned, original cost, $15,104.50, value, $15,104.50

Custom hatching 45,000 baby chicks per week for 20 weeks @ 2¢ each, $900 per week, value lost, $18,000.00

The thirty odd items asked for in Exhibit "A" total $78,604.50. The exhibit states that it will take fifteen weeks to replace the building, two weeks to install equipment, and three weeks to hatch chickens.

The defendant answered and filed a counterclaim. First, the defendants admitted that plaintiff's building was destroyed by fire and that there were 191,600 eggs in the building, but denied that the fire was a direct, sole, and proximate result of any negligence whatever on the part of the defendants. The defendants admitted that there were certain electrical disturbances along the power lines near the American Legion Building on July 12, 1961; but the defendants averred that the lines were repaired immediately, and that the occurrence on July 12, 1961 was in no way causually connected with the subsequent event charged in the declaration. The defendants admitted that the transformer in the vicinity of the hatchery building was replaced following the fire because of damage to it from the fire, but the defendants denied each and every remaining allegation contained in the declaration.

As a second defense the defendants affirmatively charged that all of the lines, transformers, and other equipment of the defendant power company in the vicinity of and for service of the plaintiff's hatchery building were installed under the provisions of and in full compliance with the National Electrical Safety Code and the rules of the Public Service Commission of the State of Mississippi.

The assignment of errors which the Court will consider are:

No. 1. The lower court erred in overruling the appellant's motion to exclude appellee's evidence and in failing to peremptorily instruct the jury to find for the appellant, since the appellee failed to prove actionable negligence on the part of the appellant.

No. 2. The lower court erred in overruling the motion by the appellant to produce certain records and documents for inspection and copying by the appellant under the provisions of Miss. Code, section 1659.

No. 3. The lower court erred in granting instructions to the appellee which permitted the jury to consider as an element of damages the cost of replacing eggs destroyed with baby chicks, contrary to the established law for determining the measure of damages in such cases.

No. 4. The lower court erred in granting instructions to the appellee which instructed the jury that it might consider the replacement cost less depreciation as the proper measure of damages for loss or destruction of real and/or personal property by fire.

No. 5. The lower court erred in granting to the appellee instructions which permitted the jury to consider as an element of damages the claim of the appellee for the loss of so-called "custom hatching."

No. 6. The lower court erred repeatedly throughout the trial of the case in commenting upon the evidence in the presence of the jury, which comments prejudicially affected the rights of the appellant.

No. 7. The court erred each time that it overruled appellant's objection to testimony offered by the appellee.

There were many lay witnesses, as well as expert witnesses to establish for the plaintiff, or appellee, the question of liability as to the cause of the fire, which was denied by witnesses for appellant.

The testimony offered on behalf of the plaintiff was to the effect that on July 12, 1961 there was a spectacular electrical disturbance on the wires of the defendant which were strung along Mississippi Highway No. 15 leading south from the Town of Bay Springs. There was testimony that one of the wires at that time burned in two and fell across the highway and continued to burn and popped even after it was on the ground. There was testimony that there was arcing, balls of fire, and electrical disturbance on August 10, 1961, which occurred on the same lines as the trouble of July 12, and on the

line running over to the plaintiff's hatchery. There was testimony that balls of fire were seen running back and forth along the wires across the highway from the east side of the highway over to the pole adjacent to the hatchery, and that there was no fire in the building at that time. Several witnesses testified that they were awakened by the noise of the electrical disturbance and saw balls of fire running up and down the wire from the pole adjacent to the hatchery and back. A witness for the plaintiff, appellee, in response to the hypothetical question that it is inescapable conclusion that certain peaks of high voltage of short duration, transient voltage, were transmitted along the various lines and went into the hatchery through the service entrance conductors down through the service equipment into the weakest link of the chain of the wiring system in the hatchery, was that, though he was unable to state at exactly what spot the fire began, he was of the opinion beyond any doubt, that the transient electrical voltage on the wiring of the appellant was the most probable cause of the fire; he stated that it was almost an inescapable conclusion that the transient voltage on the wires of the appellant were the cause of the fire under the circumstances which occurred on those lines on August 10, 1961.

The building was built on ordinary concrete flooring made out of ordinary sand. The sides of the building were made of corrugated steel or tin over rafters, and were covered in part by sheetrock. Before the fire, in preparing to take out some chickens the next morning, employees of Mr. Harrison had placed boxes in the hatchery and there was a lot of paper and debris around on the floor.

We believe that there is sufficient evidence in this case to go to the jury. The appellant is bound, and justly bound, to the very highest measure of skill and care in dealing with the deadly agency of electricity. The condition upon which a public utility

company may string and maintain its wires over and across streets and highways is that these wires must be so placed as not to be dangerous to persons and property; and it is the continuing duty of the utility to maintain its wires over the streets and highways in such a manner that they will not become dangerous to persons and property. ▆▆ ▆ While this duty is not absolute in that the utility is an insurer against all injuries and all events, it is true that the rule, because it concerns the dangerous agency of electricity, is not satisfied to relieve the utility from liability unless and until it is shown that the company has exercised the highest degree of care to prevent the danger. ▆▆ ▆ Manifestly, the duty required of the utility in respect to maintenance of its electrical wires is an active duty, not merely a passive obligation to act only when some third person has gone to the trouble to volunteer information to the company of a particular danger at a particular place.

The testimony of many witnesses of disturbances in both July and August, only a few weeks apart, indicates that there was some defect in the construction or maintenance of the lines to cause the occurrences to take place, and that when the lines came together and were fused by the strength of the current, one or both of the lines were probably damaged by pitting, that there were certain defective fuses, and that it became necessary for the company to change the 25 KVA transformer the morning after the fire for the reason that the transformer blew a fuse when it was hooked up. There were two transformers on Pole A. One transformer was to serve a 3-ton air conditioner unit. Certain wires were introduced and it was shown that these wires had been burnt in places. No one seemed able to tell why these were burned. These burnt places were some 20 to 25 feet out from Pole A. Of course there was a denial of these facts by the appellants' witnesses. Their theory

was that the power lines were properly constructed and properly maintained, and the expert witnesses even said it couldn't happen the way the appellee testified it happened. The conflict in the testimony presented an issue for the jury to decide. Temple v. McComb City Elec. Light & Power Co., 89 Miss. 1, 42 So. 874; Williams v. City of Canton, 138 Miss. 661, 103 So. 811; Miss. Power Co. v. Thomas, 162 Miss. 734, 140 So. 227.

In the case of Miss. Power & Light Co. v. Goosby, 187 Miss. 790, 192 So. 453, Anna Goosby, the appellee, sued the Mississippi Power & Light Co., appellant, for damages sustained by her because of the destruction of her house by fire, alleging negligence on the part of the appellant in the construction and maintenance of its wires charged with electricity erected over and across the roof of her house. Instead of running wires to the intersection of Elm and Washington Streets, the appellant had run the wires across her lot. There were nine wires. They had been there a long time; some of them were insulated and some were not. The insulation was ragged and the evidence of Anna tended to show that some of these wires dragged the roof of the house. When the fire was first discovered, it was on the roof near the chimney and was about the size of a washtub or 10-gallon jug, with a bluish-red flame, and there were flashes emitting along the roof of the house in proximity to the comb. Some members of the fire department testified that as the wires burned and fell to the ground they were emitting flashes of electricity, and they considered it dangerous to throw water on the house. No electric wires were installed connecting the house with electricity.

The principal assignment of error in that case on the part of the Mississippi Power & Light Co. was that the court erred in refusing it a peremptory instruction for two reasons: The evidence did not establish the probability that the fire was set out by the electric wires

of the appellant, and the evidence of Anna Goosby shows that she assumed the risk. The appellant's theory was that under physical laws it is shown in this record that the fire could not have been caused by the discharge of electrical current, and that the fire evidently originated in the interior of the house.

The Court summarized:

"In summary of the facts we think that the evidence offered on behalf of the appellee was sufficient to overcome presumption of fact that the fire originated in the interior of the house. There was sharp conflict on this question. The conflict was for the jury. The jury evidently believed the evidence of the appellee and of the appellee's witnesses, (citing several cases).

"The case at bar may be said to be a case of circumstantial evidence as to the origin of the fire at the moment, but we think the facts we have detailed are stronger against a peremptory instruction than either of the cases we have cited, supra; . . .

. . .

". . . It has been thought that insulation was necessary to prevent the escape of the electricity if it came in contact with any materials which would conduct it from the wire, and if, as testified by some of the witnesses for appellant, insulation was no longer necessary, then the fuse boxes evidently did not function in this case."

There is a question in the case at bar that the transformer did not work properly and that the amperes in there would jump from several hundred to several thousand. In the Goosby case, supra, the discharge of the blaze on the ground which was undisputed was some evidence that there was no arrest of the current by the burning of the wires when they fell to the ground. We think these facts are sufficient to support a jury's finding that the fire originated from the electrical current, and if it did, there was ample evidence to support the negligence charged.

In Miss. Power & Light Co. v. Dulaney, 239 Miss. 460, 123 So. 2d 845, the Court said:

"The appellees recovered judgment against the appellant in the amount of $15,925.00 for damages to the Ruleville Lumber Company because of a fire which occurred on January 13, 1958. It was charged and proved that the power company was operating a high voltage electric line in proximity to the plant of the Ruleville Lumber Company without a proper circuit breaker or fuse which would cut off the electricity from said lines when the same came in contact with each other or with the property of the appellees.

"The last witness who testified in the case was a consulting electrical engineer for over 30 years and who admitted that if three weeks prior to the electrical disturbance and fire on the night of January 13 two wires in the vicinity of the one that fell on the night of the 13th became crossed and fused and had to be separated with a 'hot stick' (which was proved definitely by other witnesses) would indicate that there was some defect in the construction or maintenance of that line to cause the occurrence to take place, and that when the two lines came together and were at least temporarily fused by the strength of the current that probably damaged one or both of the lines by pitting, and it would not have been a good electrical practice to tighten one of those lines without an inspection to see to what extent it was damaged or pitted without replacing the line or inspecting to see the extent of the damage."

*Dulaney* cites Temple v. McComb City Elec. Light & Power Co. and Miss. Power Co. v. Thomas, *supra,* as the law in the case. The Court said further:

"Negligence of the Power Company was proved without question in this case, and the jury was abundantly warranted in finding as it did. Hence the judgment of the circuit court must be, and it is, hereby affirmed."

■■ The appellee in the instant case depended throughout the trial on the expert witnesses' testimony to sustain liability. The appellant, to rebut this testimony, offered several witnesses which this court feels were competent to testify in answer to certain pertinent hypothetical questions asked on behalf of the appellant power company. However, the court in some instances sustained the objections to these questions, and we feel he should have overruled the objections and let the experts testify in answer to some of the hypothetical questions presented. An expert witness was asked a hypothetical question, more or less, about an experiment that was made concerning one of the transformers. "Q. Was there anything revealed from tests you have made here in the courtroom a minute ago that would indicate that a failure in this transformer had anything to do with this fire which occurred in Mr. Harrison's hatchery on the night in question?" Objection was made on grounds that the witness could not give what his tests were; that he could be asked about the condition of the transformer, and then it was for the jury to determine. The court sustained the objection and said, "Taking all of the testimony, on the part of the jury and then determine for themselves as to that particular matter as to any other matter with reference to what the truth of it is and what the real meaning of it might be and the consequencies and all that kind of things. That's a question for the jury there to determine." He sustained the objection.

■■ A registered professional electrical engineer from New Orleans, a teacher at Tulane University, an expert witness, was asked this question: "Tell us from your experience in electrical industries some of the things that could have gone wrong with the equipment I have described that was situated in Mr. Harrison's hatchery on the night of August 10 from which the fire could have originated regardless of what the condition was on

the distribution system outside.'' There was evidence in this case that the wiring had been done by some local person. Mr. Harrison had testified that they had put out the boxes with excelsior all over the floor for the purpose of getting the chickens out of the incubators the next morning. The appellee strenuously objected due to the expert being asked what could have happened, stating that there was no evidence of anything happening in the building, that they were getting in the field of possibility, not based on any evidence. The appellee contended that there was no evidence of anything happening in the building. The appellant's contention was that from the man's experience he could tell them some things that could have happened in this building which could have started the fire, even though everything had been perfect insofar as distribution was concerned. The court in a long statement before the jury finally sustained the objection, and even though this was an expert witness, the court wouldn't let him pass an opinion on that question, saying it was invading the province of the jury. There was testimony that the wiring was next to the tin up and down the rafters, that there was litter on the floor, such as excelsior, paper, and boxes.

All the expert witnesses for the appellant have a technical or peculiar skill, knowledge or experience with regard to the subject matter, presumably not within the knowledge of the ordinary man, such as a question of science and skill. See Russell v. State, 53 Miss. 367; Jones v. Finch, 37 Miss. 461; Roberson Bros. v. Mobile & Ohio Railroad Co., 155 Miss. 198, 124 So. 334. Where facts are conflicting, the party producing expert witnesses may state facts in hypothetical questions in accordance with his theory, but is not authorized to omit undisputed material evidence bearing on the issue and calculate it to influence decision; but he must state the facts whenever they are not disputed. Cates v. State,

171 Miss. 106, 157 So. 95. Since the expert witnesses on behalf of the plaintiff, the appellee, went into detail in answering hypothetical questions, it seems fair and just that the appellant, the defendant, should be given the same right to go into the hypothetical questions on the theory of the evidence produced and the knowledge of the expert witnesses, and that the expert witnesses be allowed to give their conclusions from the evidence as produced. Electricity is a highly technical commodity, and if the plaintiff could prove his case by expert testimony, it is right and just that the defendant, appellant, should have the same right. For this reason we believe the case should be reversed on the question of liability.

██ ██ Another instance on the question of the introduction of testimony was in reference to a witness, Mrs. Spainhour, testifying as to the cost of certain secondhand equipment which Mr. Harrison had bought from them, which was secondhand when they bought it. The court stated that it would not extend further back than this lady and her husband and Mr. Harrison, because that's the only testimony in this record as to what was paid for it, that what they paid for it has nothing to do with it and is foreign to the issue, and sustained the objection. At this point the appellants requested that the jury be excused because they wanted to make a record of the cost of these pieces of equipment purchased by the Spainhours one year before they sold it to Mr. Harrison. The court went into a long discussion and said, ''I will not excuse the jury for that reason because it is incompetent, inadmissable, and does not belong in this record at all, for the purposes of this trial or for the purposes of informing the appellate court or anything of the kind, because it is foreign to the issue here involved and is not in the law suit.'' (No testimony had been offered on the part of the plaintiff.) ''I'm not going to retire the jury for that purpose. However, the transaction between this plaintiff here and these

parties, the one who is testifying and her husband, may be admitted in evidence and will go in rebuttal to that of the plaintiff, but to go and start from the manufacturer of the material and equipment and all that kind of thing from the beginning is not pertinent and is not germaine. It is not essential here. It is not material and will encumber the record to the extent there will be no end." At this point the plaintiff asked the court to retire the jury because he didn't want the argument to go in before the jury. Then the court said, "The court has ruled on this and I'm not going to retire the jury and that's it. I have already ruled on this matter." We believe this is prejudicial error, for two reasons. First, the appellant assigned as one of the errors throughout the trial of the case the court's commenting upon the evidence in the presence of the jury, which comments prejudicially affected the rights of the appellant. It is true that the appellant, defendant below, didn't object to the court's commenting on his rulings before the jury. Throughout this record, there is page after page of the court's comment on its rulings in the presence of the jury. Even the appellee realized that there was argument before the jury in this respect. The court at all times should be careful as to its comments before the jury, but since there was no objection outright to the comments of the court, we do not pass on that question in this case; maybe it will not happen if the case is retired.

In the cases of Martin v. Gill, 182 Miss. 810, 181 So. 849; Hitt v. State, 217 Miss. 61, 63 So. 665, the court announced the well-established rule that when a party is seeking a reversal because of excluded testimony, he must have shown in the record what the testimony would have been if the witness had been allowed to testify, so that the appellate court may see from the record itself whether the offered evidence would be material and admissible. It seems to us that the point

is well taken by the appellant, because if the trial court will permit it to deny a party the right to show in the record what a proposed witness would testify, the result would be, no matter how material and important the testimony might be, the party offering the witness and his testimony would be helpless to obtain relief on appeal. ██ ██ The courts hold that a counsel has the right, when an objection to the testimony of a witness is sustained, to show in the record by appropriate means the nature and content of the proposed testimony. We believe the court erred in denying to the appellant this right which he has under the law.

The appellant assigns as error the court's overruling the motion to produce certain records and documents for inspection and copying by the appellant under the provisions of section 1659 of the Code of 1942, which is as follows:

"The Court in which any action or suit is pending may, on good cause shown, after notice of the application to the opposite party, in term time or in vacation, order either party to make available to the other, within a specified time, and on such terms as may be imposed, an inspection and copy, or permission to take a copy or photograph of any books, papers, documents, accounts, letters, photographs, objects, or tangible things, in his possession or under his control containing evidence relating to the merits of the action or proceeding or of the defense thereto; . . ."

This is a case to recover damages for a total loss to both real and personal property. There is intermingled throughout the record of this case testimony and issues of fact as to the original cost, replacement cost, depreciation and fair market value of numerous items of both real and personal property. The claims of the appellee may be stated in three classifications as to value claimed: (1) Value of real and personal property, damaged and/or destroyed, (2) Value of eggs burned, and

the value or cost of baby chicks purchased as replacement for those eggs, and (3) An item designated as "custom hatching 45,000 chicks per week for 20 weeks at 2¢ each", which the testimony reveals to be in effect some kind of a claim for loss profits.

The appellant denied the allegations as to these items and filed a preliminary motion to require the appellee to produce certain records, in accordance with the statute. The appellee was the only person that knew anything about the value, cost, profit, sales and overheads involved. The documents relative to the proof of these matters would be necessary in the defense of the case, and certainly the appellee had the whole and entire possession and control of such matters.

This Court in Ford v. Commercial Securities Company, Inc., 236 Miss. 130, 109 So. 2d 352 (1959) stated:

"One major purpose of any judicial proceeding is to ascertain the facts relevant to the issues in the particular action. Motions of this type should be liberally construed in favor of the applicant, with a sound discretion in the trial court to prevent undue hardship to the parties in possession of the records."

The case of Shepherd v. Johnston, 201 Miss. 99, 28 So. 2d 661 (1947) involved a claim of ownership predicated on an alleged resulting trust and motion was made for an inspection of the books and records pertaining to the purchase and operation of the land in question. The motion was overruled and this Court held that under the above cited section of the Code the complainants were entitled to the inspection as requested and it was reversible error to overrule the motion in that behalf.

We believe that since this evidence was entirely within the possession of the appellee, the complainant, and there was no other way to defend the lawsuit than to get this information, it is a serious question and the

court should have sustained the motion, and this is therefore reversible error.

The appellant objects to two instructions of the appellee. The instructions are as follows:

1. "The Court instructs the jury for the plaintiff that if you find a verdice for the plaintiff you should assess such damages in his favor as will, in your judgment, under all of the evidence in this case, fully, fairly and reasonably compensate him for the injury to his building (real property), and in arriving at such amount you should consider (1) the difference in the fair market value of the land and building immediately before and immediately after the fire, or (2) the sum reasonably necessary to restore the building to substantially the condition it was in immediately prior to the fire, whichever is less; and also such damages as will, in your judgment, under all of the evidence in this case, fully, fairly and reasonably compensate the plaintiff for the loss of personal property which he sustained, and in arriving at the proper sum the measure of damages will be the fair market value of the personal property items totally destroyed immediately before the fire. If you find for the plaintiff, you should also award to him such consequential damages as will fairly and reasonably compensate him for the extra-ordinary loss, if any, he sustained as a result of baby chick replacement for eggs burned, if any, and custom hatching of baby chicks, if any."

2. "The Court instructs the jury for the plaintiff that if you find for the plaintiff you should find an amount which would adequately compensate the plaintiff for the fair market value of the real and personal property of the plaintiff which was destroyed by fire on or about August 10, 1961, and for the loss sustained by the plaintiff, if any, as a result of having to purchase baby chicks to replace the embryonic chicks destroyed in the fire, and as a result of having to

have chicks custom hatched to fulfill contracts for the sale and delivery of such chicks."

The appellant's contention is that it was error to instruct for the appellee, which permitted the jury to consider as an element of damages the cost of replacing eggs destroyed with baby chickens. The appellee contends that at the time of the fire there were 191,600 eggs in the hatchery, all of which were destroyed by the fire. In his claim for damages, both in his declaration and by way of his testimony, the appellee makes no claim for the value of eggs destroyed, but rather demands judgment for the cost of baby chickens purchased to replace these eggs and contends that the lower court authorized such a recovery in its instruction.

In 15 Am. Jur., Damages, sec. 106, it is said:

"A person whose property is taken, damaged or destroyed by the negligent or wrongful act of the omission of another is entitled to compensation from such other person for the damage sustained. He is entitled to such a sum as will restore him as near as possible to his former position and may, therefore, recover the actual loss sustained. He may not, however, make any profit out of his injury, and his recovery is limited to compensation for the damages naturally and necessarily resulting from the injury alleged, except where the circumstances authorize a recovery for exemplary damages."

In the case of Sears, Roebuck & Co. v. Creekmore, 199 Miss. 48, 23 So. 2d 250, the court said:

"In case of total and tortious destruction of a house by fire, the basis for computing damage to the owner is a comparison of the value of the whole property before and after the fire. 15 Am. Jur., Damages, sec. 109, p. 517; 25 C.J.S., Damages, sec. 85, p. 608. This is and should be the general rule."

In Oleck, Damages to Persons and Property, sec. 200, Property Damage in General, it is stated:

"Anyone whose property is damaged, destroyed or taken away by the negligence or wrong of others is entitled to recover damages from the wrongdoer in a sum sufficient to compensate him for the loss and restore him, in effect, to his former situation. The recovery must be in proportion to the kind or amount of interest which the injured party had in the property. Compensation is the basic right of damages, in property damage cases."

Section 204, Market Value, by the same author, states:

"The usual measure of value for loss or destruction of personal property is the market value, if any, not the value to the particular owner. This, of course, is true only if the thing has a market value."

In the early case of Greenwald v. Yazoo & M. V. R. Co., 115 Miss. 598, 76 So. 557, the court held that the market value of personal property destroyed was the proper measure of damage. The opinion stated:

"We think the court may judicially know that blue-blooded hunting dogs have a market, and in this case the court should have instructed the jury to fix the value of the dog in question at such sum as the evidence shows that a man who wanted to buy a dog like this one would be willing to pay for same; and to aid the jury in arriving at the value of the dog in this case, the court should have permitted the jury to consider the testimony as to the value of such dogs in other places, wherein the owner might find a purchaser."

Thus it is to be seen that in computation of damages a person is to be made whole, or complete satisfaction is to be made, or he is to recover the value of the property destroyed; it is never contemplated that the injured party should realize a profit from the damages sustained.

There is testimony in this case that the market value of eggs at the time of the fire was 55¢ per dozen. The evidence is to the effect that, out of the 191,600 eggs,

155,000 would hatch, and would cost 1½ to 2¢ per chicken to hatch. The appellee was claiming $15,104.50 for chickens purchased to replace these eggs, which apparently may have been allowed by the jury. The commercial value of the eggs would have amounted to only approximately $8,781.30. The demand therefore was nearly twice the actual market value of the eggs lost. It would seem, considering the cost of overhead which the appellee himself admitted to be at least 1½ to 2¢ per chicken, there was a failure to deduct operating costs. While the appellee should be entitled to the value of the eggs destroyed, he certainly is not entitled to profits.

In the case of Trustees of Dartmouth College v. International Paper Co., 132 F. 92, trespass is considered. As to the question of value of trees cut at the time, the Court quoted Pine River Logging Co. v. U.S., 186 U.S. 279, 22 Sup. Ct. 920, 46 L. Ed. 1164, at p. 293, 186 U.S., p. 926, 22 Sup. Ct., 46 L. Ed. 1164, which held:

"Where the trespass is the result of inadvertance or mistake, and the wrong was not intentional, the value of the property when first taken must govern. Or, if the conversion sued for was after value had been added to it by the work of the defendant, he should be credited with this addition. Upon the other hand, if the trespass be willfully committed, the trespasser can obtain no credit for the labor expended upon it, and is liable for the full value when seized."

The Court continued:

"As here applicable, the rule thus laid down comes to this: If the defendant's admitted conversion was the result of inadvertence or mistake, it is liable only for stumpage, or at most for the value of the logs immediately after their cutting. If the conversion was willful, the defendant is liable for the value of the goods, however improved. This rule, or one closely resembling it, is generally recognized, though courts are not unanimous."

In White v. Yawkey, 108 Ala. 270, 19 So. 360, 32 L.R.A. 199, the Court said:

". . . the modern authorities are practically unanimous in holding that the rule of just compensation for the injuries sustained, which is the ideal measure of actual damages, does not require the assessment, against an inadvertent trespasser, of the accession to the value of a chattel which his labor has produced, but that he is entitled to an abatement therefor from the enhanced value."

A similar case is Trustees of the Proprietors of Kingston v. Lehigh Valley Coal Co. (No. 2), 241 Pa. 481, 88 A. 768, which is for the wrongful removal of coal from the plaintiff's land made by the person who claimed under the lessee of the land. As to the measure of damages, the court said:

"It is urged that the royalty value of the coal fixed by the court below was not a proper measure of its value in place, and that plaintiff was entitled to recover the value of the coal at the pit's mouth, deducting therefrom the cost of mining and haulage."

The value of the coal at the pit's mouth should never be allowed in this class of cases if there is evidence to show its value in place. See Goodyear Tire & Rubber Co. v. Gadsen S & G Co., 248 Ala. 273, 27 So. 2d 578; Lafayette Quay et al. v. Duluth's Southshore Atl. Ry. Co., 116 N.W. 1101, 18 L. Rep. Anno. 250; Allis v. Mc-Lean, 48 Mich. 428, 12 N.W. 640. It was held in this case that for failure on the part of the manufacturer to furnish machinery known to be desired for the purpose of fitting out a mill, such failure resulted in an interruption of the business of manufacturing, and a consequent loss of profits, profits that could not be recovered for the reason that the profits of running a sawmill are too uncertain, indefinite, and contingent. They depend on many circumstances, among which are capital, skill, supply of logs, supply and steadiness of labor;

one man may fail while another prospers, and the same man may fail at one time and prosper at another, although the perspective outlook seems equally favorable at both times. Hutchinson Manuf. Co. v. Pinch, 91 Mich. 156, 51 N.W. 930, 30 Am. St. Rep. 463.

15 Am. Jur., section 156 at page 573 states:

"Generally, no recovery can be had for loss of the profits that might have resulted from the manufacture of raw material into other articles, either in an action for breach of a contract to furnish such material or in action for its negligent destruction, since such profits are too remote and speculative to serve as the basis for an award of damages."

The case of Stanley Co. of America v. Hercules Powder Co., 45 A.L.R. 2d 1106, is a tort action for negligence of the Hercules Powder Co. for structural damage to one of the plaintiff's theaters and loss of profits during temporary suspension of performances at the theater while repairs were being effected. The alleged cause of the damage was an explosion at a manufacturing plant operated by the defendant. The jury rendered a verdict for $40,000. In its decision the court stated:

"Among the questions involved in the case is the question whether the trial court abused its discretion in its exercise of control of the reception of evidence on the issue of loss of profits.

"Loss of profits, where based on sound fact and not on mere opinion evidence without factual support, is recognized as a proper measure of damages if 'capable of being estimated with a reasonable degree of certainty' . . . . In tort cases, profits which are remote, speculative or uncertain are neither an element of damages nor evidence of damages."

██ █ To permit the recovery of twice the cost of the value of the eggs as the evidence shows would be no different than allowing the operator of a sawmill to

measure his damages for loss of logs in terms of value of finished lumber such logs would produce, and further without allowing any deductions for the cost of overhead incurred ordinarily in producing such lumber. To do so would certainly be in the realm of speculation and uncertainty, or too remote and speculative to serve as a basis of an award. We believe such instruction is reversible error.

■■ The appellant contends that the granting of the instruction to the appellee which instructed the jury that it might consider the replacement cost less depreciation as the proper measure of damages for the loss or destruction of real or personal property by fire was error, saying that replacement cost less depreciation is not the proper measure of damages for the loss or destruction of the property. In appellee's Exhibit "A", itemizing certain damages, each item is charged on the fair market value thereof, and the fair market value is arrived at by using replacement cost less the proper depreciation on each item. Much evidence was given on behalf of the complainant, the appellee, as to the actual cost of replacement at the time of the trial, less depreciation according to a yearly schedule. Especially is this true and is in the evidence as to the damages to the building. It was stated that Harrison called up a contractor one evening, had him come around, showed him where the building had been destroyed, and told him about certain things and how the building was built, and got him to give him an estimate as to what it would cost to replace it; then he put certain depreciation value per year from the year 1950 when the building was built, estimating something like 25% depreciation. He estimated the replacement cost at something over $16,-000, and he thought he was entitled to over $10,000 loss.

In the case of Sears, Roebuck & Co. v. Creekmore, supra, the Court stated that the proper method of computing damage to the owner is a comparison of the

value of the whole property before and after the fire. The Court further stated the principal instruction for the plaintiff authorized the jury, upon a finding of the prerequisite facts showing liability, to find for the plaintiff in such sum or sums as would compensate him for the damages sustained as shown by a preponderance of the evidence. Taken in connection with plaintiff's evidence of replacement cost, admitted over objection, it failed to furnish the jury with the proper basis for estimate, and constituted reversible error, citing Greenwald v. Y. & M. V. R. Co., 115 Miss. 598, 76 So. 557.

The plaintiff, in trying to get before the jury the estimated cost, stated that he didn't know what the building cost him when he built it in 1950, that he kept no records of it, thereby giving the jury no evidence as to what the building really cost him. The only thing the jury could go by was this estimate by a contractor who had probably never seen the building nor knew anything about it other than what Mr. Harrison had told him. The jury had no basis to go on other than the estimate cost of replacement of the building. In other words, the jury had no estimate as to the value of the entire property before and after the loss, other than the estimate value of the contractor. We believe this is reversible error.

Appellant further contends that granting to the appellee instructions which permitted the jury to consider as an element of damages the claim of appellee for the loss of so-called "custom hatching" was error. In Exhibit "A" the appellee included an item designated as "custom hatching 45,000 baby chicks per week for 20 weeks at 2¢ each — $900 per week, $18,000." The instruction granted by the court to the appellee authorized the jury to grant recovery for such custom hatching.

In justifying this claim, the appellee states that Harrison was conducting an integrated operation of feeding flocks which laid eggs, or hatching those eggs

in the hatchery, and of placing the baby chicks for being raised and of selling the broilers for income. Thus the breaking of the chain by the destruction of the hatchery resulted in greater damages to the appellee than the damages which would have been suffered by one who owned only a hatchery. In other words, to continue his operation, it was necessary for appellee to secure someone else who owned a hatchery to hatch his eggs. The appellee delivered eggs which were laid by his flock to another hatchery, where the eggs were hatched at a cost of 2¢ each, and the baby chicks were returned to the appellee to be placed with his regular farmers for raising the baby chicks to broiler size in order that the broilers might be sold for cash income. It was necessary to have these eggs hatched in order to minimize the damages suffered by the appellee in order to continue his operation with as little loss as possible. Appellee's loss, as a result of the fire, but for the custom hatching, would have been much greater because the only thing he could have done with the eggs laid by his flock would have been to sell them to the open market, and then he would have been unable to supply baby chicks to the farmers to hire for raising same, and would have been unable to supply the income earned from the raising and selling of broilers on the market.

Therefore, appellee submits that the securing of the custom hatching, as a matter of fact, did mitigate the damages, and that for these reasons appellee is entitled to the sum of $18,000 for custom hatching 45,000 eggs each week for 20 weeks, 900,000 eggs @ 2¢ each.

Appellee further claimed that the 20-week period is the time it would have taken to replace and rebuild the hatchery which had been destroyed as a result of the negligent conduct of the appellant.

In trying to sustain this claim of $18,000 the appellee does not cite any law or rule in which to guide the court

in passing on this question. The court has been unable to find any case in point.

In the case of Stigall v. Sharkey County, 213 Miss. 798, 58 So. 2d 5, in reference to the destruction of growing crops, the Court stated:

"It is well settled that the proper method to be used in proving the damages in this case is to show the value of the crop at the time of destruction. 25 C.J.S., Damages, Sec. 85 b, p. 610, says: 'The measure of damages for the destruction of, or injury to, a crop is its value at the time and place of destruction.' The rule for which appellee contends applies only to a permanent injury to real property. 25 C.J.S., Damages, Sec. 84, p. 603." See also Aerial Agr. Serv. of Mont. v. Richard, 264 F. 2d 341.

██ ██ This is a case of total loss in which we feel that the appellee would be entitled to the actual value of the property destroyed. Of course he's entitled to the market value of the eggs that were put in the incubators and were burned, and we have so held. The appellee is asking for the value of the property destroyed and in addition is requesting the court to allow $18,000 for profits which will accrue within the 20-week period. Since this is a tort action, the only way the court can pass on it is as to the law of tort, and not as to what he might have been entitled to had there been a contract in this case involving the power company and the appellee.

In one of our earlier cases, Prince v. U. S., 23 Ct. Cl. 106, 174 U. S. 373; 19 Supp. Ct. R. 765, where oxen which were used to draw loads of merchandise was stolen by raiding Indians, it was held that there might be a recovery for the value of the animals, but not for consequential damages for deterioration in the value of the merchandise.

In Harman v. Callahan, Tex. Civ. App., 35 S. W. 705, it was held that a person cannot in an action against

another for killing some of his animals, recover for time spent in searching for his other animals, because he feared defendant would also kill them.

There is no testimony or proof that the appellee had ever operated at a profit or that he was doing so at the time of the fire. The time element is used as a quotient in which to rebuild his building and get into operation. He is rebutted by the fact that another contractor said he could do the same work in several less weeks. The appellee's proof is to the effect that only about 80% or more of the eggs used ever materialized in baby chicks. Also that it cost him 1½ to 2¢ per chick to develop the baby chicks. At most this item would boil down to the point of speculative profits. There is no consideration as to expenses or any other type of overhead in developing the chickens.

In 15 Am. Jur., Damages, Section 156, it is said:

"Generally, no recovery can be had for loss of the profits that might have resulted from the manufacture of raw materials into other articles, either in an action for breach of a contract to furnish such material or in an action for its negligent destruction, since such profits are too remote and speculative to serve as the basis for an award of damages."

In Section 157 of the same work, it is said:

"As a general rule, the expected profits of a mercantile business are too remote, speculative and uncertain to sustain a judgment for their loss. In many cases a recovery for the loss of future profits caused by the interruption or breaking up of an established business has been denied on this ground, unless, as stated in certain cases, the act which occasioned the loss was malicious. According to the weight of authority, however, a recovery may be had for such losses where they are reasonably certain in character and are the proximate result of either tort or a breach of contract or where, in case of contract, they may be reasonably sup-

posed to have been within the contemplation of the parties, when the contract was made, as the probable result of a breach. In such cases, the damages may be estimated according to the average percentage of mercantile profits. Proof of the gross receipts of the business standing alone, however, is not sufficient. The proof must pass the realm of conjecture, speculation, or opinion not founded on facts, and must consist of actual facts from which a reasonably accurate conclusion regarding the cause and the amount of the loss can be logically and rationally drawn.

"To come within the rule, it must be made to appear that the business which is claimed to have been interrupted was an established one which had been successfully conducted for such a length of time and had such a trade established that the profits thereof are reasonably ascertainable."

In Montgomery Ward & Co. v. Hutchison, 173 Miss. 701, 159 So. 862, the Court stated:

"Under our jurisprudence, the rule as to uncertain or speculative damages does not apply to uncertainty as to the amount of the profits which would have been derived, but to uncertainties or speculation as to whether (1) the loss of profits was the result of the wrong, and (2) whether any such profits would have been derived at all."

Miller v. Reiter, 155 Minn. 110, 192 N. W. 740, citing Olson v. Naymark, 177 Minn. 383, 225 N. W. 275, stated that the tendency of the court has been to ascertain damages, when an actual wrong has been done, though doing so involves labor, rather than to deny relief with the easy statement that the damages sought are too speculative and conjectural or too remote to permit a recovery. There should be caution, especially in matters of lost profits, and the court should supervise the result of the jury work.

In 25 C.J.S., section 44, Torts, it is stated:

"In tort cases, the profits recoverable are limited as to probable, as distinguished from possible profits. . .

". . . . Where there has been an entire loss of property involved in the action, the full value of the property is the measure of damages and there can be no recovery for anticipated profits. One deprived of his property in a retail establishment cannot recover both lost profits and the value of the use of the premises and equipment." Section 83, Injuries to Personal Property, continues:

"On the other hand, one who recovers the full value of a chattel destroyed through the negligence of another ordinarily cannot recover for the value of the use thereof after it was destroyed."

We believe appellant should not recover on the item of $18,000 for custom hatching for the reason that the running of a hatchery is too uncertain, indefinite, and contingent. It depends on many circumstances, capital, skill, supply of materials, and steadiness of labor. One man may fail while another prospers, and the same man may fail at one time and prosper at another, although the prospective outlook seems equally favorable at both times. Hutchinson Manuf. Co. v. Pinch, *supra*. We believe that such claim is remote, speculative, and uncertain.

Reversed and remanded.

*McGehee, C. J., Kyle, Rodgers and Jones, JJ.,* concur.